# EXHIBIT A
# BLANCA DOMINGUEZ DEPOSITION EXCERPTS

```
 1                UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   DEBRA SANTACRUZ             )
           PLAINTIFF,            )
 4                               )
     VS.                         ) CIVIL ACTION NO.
 5                               ) 21-CV-00719-FB
                                 )
 6   VIA METROPOLITAN TRANSIT,   )
           DEFENDANT.            )
 7
                                      COPY
 8

 9   ********************************************************

10                     ORAL DEPOSITION OF

11                     BLANCA E. DOMINGUEZ

12                        JUNE 14, 2022

13   ********************************************************

14

15

16      ORAL DEPOSITION of BLANCA E. DOMINGUEZ, produced

17   as a witness at the instance of the Plaintiff, and

18   duly sworn, was taken in the above-styled and numbered

19   cause on the 14th day of June, 2022, from 10:55 a.m.

20   to 12:12 p.m., before Sharon L. McDonald, CSR, in and

21   for the State of Texas, reported by machine shorthand,

22   at the offices of Dykema Gossett, PLLC, 112 E. Pecan

23   Suite 1800, San Antonio, Texas, pursuant to the

24   Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.
```

```
 1      A      Yes.
 2      Q      Do you remember who the other lead was?
 3      A      Yes.  We had Cynthia Butler and Elliott Chapa.
 4      Q      So if I'm sick, I don't call them, I call you?
 5      A      Correct.
 6      Q      Or text?  Is texting okay?
 7      A      No.
 8      Q      No.  So you, basically, manage a call-in place,
 9   is that right, because people are calling in to make
10   reservations?
11      A      Yes.
12      Q      Is there, like, a phone queue that people call
13   and they wait for their turn?
14      A      Yes.
15      Q      Did that queue start getting bigger in 2019?
16      A      I know that we did have periods of high queues.
17   We had days where it was busier than others.  Mondays
18   were busy.  Fridays were busy.  So on those days, there
19   would be a high queue.
20      Q      Was 2019 any bigger than 2018?
21             MS. MCELROY:  Objection, calls for
22   speculation, lacks foundation.
23      A      I couldn't give you specifics.
24      Q      (BY MR. CRANE) Was there something called a
25   mandate employee or mandated reservation agent?
```

1  A   I don't believe at that time we had any mandated
2  work shifts.
3  Q   Can you explain to the jury what a mandated
4  agent would be?  What does that mean?
5  A   Well, at the present moment, because we're so
6  short staffed, on the weekends we have to mandate
7  individuals.  In other words, we cancel their day off and
8  they're scheduled to work.
9  Q   In 2019, did you -- was there a process to time
10 how long reservations agents would take when they go to
11 the bathroom?
12 A   No, sir.
13 Q   It was -- what's the process for going to the
14 bathroom if I'm a reservation agent?
15 A   You would finish your call, let the lead know
16 that you needed to step away, and you'd go down the hall.
17 Q   And there's -- I don't have to, like, push a
18 button on my phone?
19 A   You do.  You have to push what we call
20 unavailable, and so that way your phone doesn't receive
21 calls while you're not there.
22 Q   Did you, yourself, ever have a process to time
23 people to see how long they would take in the bathroom?
24 A   No, sir.
25 Q   You never timed Debra Santacruz when she went to

```
 1  was 2016, were you the one who told her that she could
 2  become full time?
 3       A    I don't recall.  I don't know if it was me -- if
 4  it wasn't me, it was Daniel.
 5       Q    Do you remember if you talked to her about
 6  moving from part time to full time?
 7       A    I'm sure.
 8       Q    You're sure you would have had a talk like that?
 9       A    Yes.  We would have had to have discussed
10  schedules, schedule changes, that type of thing.
11       Q    Did you talk about her back when you talked to
12  her about going full time?
13       A    About her back?
14       Q    Her back.
15       A    No, sir.
16       Q    Were you aware that she had a bad back?
17       A    No, I did not.
18       Q    You were never aware she had chronic back pain?
19       A    No, I did not.
20       Q    So in 2016 when you talked to her about moving
21  to full time, you did not say or ask her, Can you do this
22  with your back?
23       A    No, I did not.
24       Q    Meaning, I guess, can you -- can your back
25  handle going full time -- you're saying you did not ask
```

1  her about her back now becoming full time?
2      A    Correct.  That wouldn't have been part of the
3  discussion that we had.  The only thing that I was
4  concerned with was the schedule because she would be
5  moving from a part-time schedule to a full-time schedule.
6      Q    So her health was never a concern moving to full
7  time, for you, for Blanca Dominguez?
8      A    That I knew that she had a back problem or that
9  there would be a problem, no.
10     Q    And are you testifying today that you're not
11 aware that she had a back problem at all, like, ever
12 anytime?
13     A    No, sir.
14     Q    Did you ever see her do her stretches in her
15 chair --
16     A    No, I did not.
17     Q    -- at work?  You did not?
18     A    No.
19     Q    She would face the back of her chair sitting on
20 her knees and you're saying you never saw her do that?
21     A    No, I did not.  As a matter of fact, if I had, I
22 would have stopped her from doing that because that's a
23 safety hazard.
24     Q    You don't remember telling her, You can do those
25 sketches so long as you don't fall?

```
 1  location that she's at.  My office actually -- the
 2  doorway to my office faces a wall, so I don't know how
 3  she would have heard Chaipan tell me or ask me what she
 4  was doing because I'm not in the same vicinity as the
 5  agents.
 6      Q   Did you ever see Gloria Dominguez give ibuprofen
 7  to Debra Santacruz?
 8      A   I did not.
 9      Q   Does Gloria take ibuprofen at work?
10          MS. MCELROY:  Objection, calls for
11  speculation.
12      A   I don't know.
13      Q   (BY MR. CRANE) Have you ever seen Gloria
14  Dominguez take an ibuprofen at work?
15      A   I have not.
16      Q   And you've never seen her give ibuprofen to
17  Debra Santacruz?
18          MS. MCELROY:  Objection, asked and
19  answered.
20      A   No.
21      Q   (BY MR. CRANE) Does Gloria Dominguez have her
22  own pain issue at work, to your knowledge?
23      A   To my knowledge, yes.
24      Q   But you've never seen her take anything for the
25  pain at work?
```

1    A    It depends.  If she sees me, she can give it to
2 me.  Or if she sees Gloria she can give it to Gloria and
3 Gloria will provide it to me.
4    Q    (BY MR. CRANE) And then where would the papers
5 go?
6    A    We send it to payroll.
7    Q    And do you know where they go from there?
8    A    I do not.
9    Q    Would they go in Debbie Santacruz's file; do you
10 know?
11         MS. MCELROY:  Objection.
12    A    I don't know.
13    Q    (BY MR. CRANE) You're saying no, you don't know,
14 or no, they don't go to her file?
15    A    No, I don't know.
16    Q    If Debbie Santacruz says she gave these papers
17 to you and to Gloria, you're saying that did not happen?
18    A    I did not receive that.
19    Q    And you see at the top -- these are notes signed
20 by the doctor.  It says right there, Chronic low back
21 pain.  Lower back -- c/o low back pain, and then, colon,
22 chronic low back pain.  Has seen Dr. Hirsch.  Do you see
23 that section?
24    A    I do see it.
25    Q    But you're saying you're not aware of Debbie

```
 1  Santacruz having chronic low back pain?
 2       A    No.
 3       Q    And in the, I don't know, 18 years that you knew
 4  her she never mentioned low back pain --
 5       A    No.
 6       Q    -- to -- you're saying "no"?
 7       A    I'm saying "no."
 8       Q    And you never heard her talking to a coworker
 9  about low back pain?
10       A    No.
11       Q    Or talking to Gloria about low back pain?
12       A    I didn't hear that.
13       Q    When Debbie Santacruz was out for three days or
14  longer and she had to bring a medical note back, was she
15  generally good about doing that?
16       A    Yes.
17       Q    It would have violated company rules to not do
18  that, correct?
19            MS. MCELROY:  Objection, misstates the
20  testimony, calls for speculation, lacks foundation.
21       A    The company requires that.
22       Q    (BY MR. CRANE) So if she didn't bring -- if she
23  was gone three days or longer and did not come with
24  medical notes, somebody would have talked to her about
25  it; is that right?
```

1    MS. MCELROY: Objection, calls for
2  speculation, lacks foundation, misstates the testimony.
3    A    Correct.
4    Q    (BY MR. CRANE) And that person probably would
5  have been you, correct?
6    MS. MCELROY: Objection, calls for
7  speculation.
8    A    More than likely, it would have been the
9  secretary. She would have brought it to our attention
10 and then we would have asked Debra for it.
11   Q    (BY MR. CRANE) And what's the secretary's name?
12   A    Yvonne Guardiola.
13   Q    So I'd like you to look at this middle section.
14 I'll just point it out to you. Right there. It's a note
15 by the doctor:
16        Patient here on meds. It's listed main
17   complaint, chronic back pain that is worse after
18   sitting at her job and then needs to get up, but can
19   only do that every few hours.
20        You're saying you were never aware that
21 Debbie Santacruz had a need to get up every few hours
22 from her chair?
23   A    No, I did not.
24   Q    Did she get up from her chair every few hours?
25   A    I would see her standing from time to time, but

1  I was unaware that it was related to her back.
2      Q    And you didn't ask her why she was standing?
3      A    No, because we had just received the risers for
4  the agents where they can stand from their desk or at
5  their desk, and so many of them would utilize that.
6      Q    Was she using -- when you saw her standing up,
7  was she using a riser?
8      A    She was.
9      Q    Prior to 2019, did you ever see her standing up
10 at her desk?
11     A    Perhaps.  I don't remember.
12     Q    And you don't remember asking her, Why are you
13 standing up?
14     A    No.
15     Q    The risers came in 2019; is that right?
16     A    I believe so.  We had a VP that provided those
17 for us.
18     Q    So wouldn't it be a little odd if somebody was
19 standing up in 2018 or 2017?
20     A    No.
21     Q    No, it would not be odd?
22     A    No.
23     Q    Other reservation agents would stand up at their
24 desk?
25     A    I used to do it, yes.

```
 1      A    Correct.
 2      Q    Or text you?
 3      A    No.  Call me.
 4      Q    Debbie Santacruz then called you on Monday
 5 night; is that right?
 6      A    We had a conversation Monday night, yes.
 7      Q    How did that conversation go?
 8      A    Well, she was asking that I provide a letter to
 9 her so that she could submit that letter to Nationwide so
10 she could pull her funds from them.  I remember in that
11 conversation asking her if she had applied for FMLA or if
12 she had asked for FMLA to apply to the dates that she was
13 out.  She told me she had not.
14           And so I couldn't make any kind of comment
15 on whether she was going to be dismissed or not, or if I
16 was going to recommend that she be dismissed because I
17 really had no -- no information from Belinda to say
18 whether those days were going to be covered or not.  So
19 it was -- it was just kind of like going round and round
20 in circles.  I couldn't give her what she wanted, and so
21 it just basically ended there.
22      Q    You don't remember her saying or asking if she
23 can come to work Tuesday, the next day?
24      A    I don't believe so.  I believe she told me she
25 would not be in on Tuesday.
```

1   Q   Did you -- did she say she quits?
2   A   No.
3   Q   Did she say, Am I fired?
4   A   At that time, I don't believe we talked about
5   that.
6   Q   Do you remember her saying, more or less, Gloria
7   said to call you to see if I can go to work tomorrow, if
8   I still have a job?  Because Belinda didn't approve the
9   absences, I'm calling to find out how that is going to
10  work.  You don't remember her saying something like that?
11  A   No, I don't.
12  Q   If she says that she did say that to you, that
13  would be untruthful?
14  A   Correct.
15  Q   You don't remember saying to her in response --
16  again, this is Debbie Santacruz's memory, so I'm asking
17  you how accurate it is.  Blanca -- you -- said that's not
18  going -- this is how it's going to work.  You have 17
19  points.  I'm tired of it.  Tired of your shit.  Going to
20  get back with Daniel Chaipan in the morning, and that's
21  it.  You're terminated.  You don't remember saying
22  anything like that to her?
23  A   No.
24  Q   Did you tell her she had 17 points?
25  A   We may have discussed points, but it was not in

1  that context.
2     Q    You didn't say, I'm tired of your shit?
3     A    No, sir.  And I can tell you exactly where I was
4  when I had that conversation with her.  We were at a
5  baseball park.  My son was practicing at McAllister Park
6  and I was sitting amongst a lot of people.  There was no
7  way that I would make that kind of comment.
8     Q    And nothing like that where she just maybe
9  misunderstood, the wind on the phone maybe made it hard
10 to hear?  Nothing she misunderstood?
11    A    I don't see how.
12    Q    She didn't then say something to you more or
13 less, How am I going to work?  But Blanca -- and then did
14 you hang up on her?
15    A    No.
16    Q    She says you did hang up on her.  You're saying
17 that's not correct?
18    A    That's not correct.  I did not hang up.
19    Q    Did she call you back after you hung up?  After
20 you two hung up, did she call you again?
21    A    I don't recall receiving another call from her,
22 no.  The next thing that I remember engaging with her was
23 the text messages and that, I want to say, was the last
24 communication I had with her.
25    Q    Did you talk to her about her absences -- before

1  April 22nd or before April 19th, did you sometimes talk
2  to her about her absences?
3      A    Yes.
4      Q    How often?
5      A    Well, whenever she -- we had an attendance
6  policy in place, and so if she reached the point where a
7  written reminder was required, then I had to present that
8  to her and it would require her signature.
9           So the way the attendance policy worked was
10 at six points, it was an oral reminder.  At eight points,
11 it was a written reminder.  At 10 points, it was a
12 written reminder.  At 12 points, it was a written
13 reminder.  And on the 14, that would be the termination.
14     Q    But wasn't that like an ongoing issue for you
15 with Debbie Santacruz that she had too many absences?
16     A    It was just based on the attendance policy.  So
17 if she reached one of those benchmarks, that would be the
18 action that would be taken.  There were times when she
19 would go talk to Daniel Chaipan, and Mr. Chaipan would
20 request that points be removed for whatever reason, and I
21 would remove them.
22          (Exhibit 3 marked.)
23     Q    (BY MR. CRANE) I'm showing you what's marked
24 Exhibit Number 3 and ask you to look at that for a
25 minute.

```
 1  is why I was out three days or longer; is that correct?
 2       A    Right.  And then I forward that to payroll.
 3       Q    Have you had any employees, any reservation
 4  agents who missed three days or more of work due to a
 5  permanent impairment, a permanent disability?
 6       A    I wouldn't know that.
 7       Q    So the final approving person for termination
 8  would be Sylvia Castillo?
 9       A    Correct.
10       Q    And what is Daniel Chaipan's role in a
11  termination?  Does he have a role?
12            MS. MCELROY:  Objection, lacks foundation,
13  calls for speculation.
14       A    Well, he's my supervisor, so he's the one that I
15  report to and I have to provide the information.  And
16  then his supervisor is Sylvia, so he would give that
17  information to Sylvia.
18       Q    (BY MR. CRANE) But Sylvia doesn't -- if it's a
19  reservation agent, Sylvia won't know the person.  I mean,
20  does she ask you or Daniel Chaipan about this person?
21            MS. MCELROY:  Objection, calls for
22  speculation, lacks foundation.
23       A    She would not.
24       Q    (BY MR. CRANE) Well, let's talk about Norma
25  Garcia.  When Norma Garcia was fired, did Daniel Chaipan
```