# EXHIBIT C
# DEBRA SANTACRUZ DEPOSITION EXCERPTS

Case 5:21-cv-00719-FB   Document 22-3   Filed 08/11/22   Page 2 of 27

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

DEBRA SANTACRUZ,           )
                           )
        Plaintiff,         )
                           )
VS.             ) CIVIL ACTION
                           )
        ) NO.: 5:21-CV-00719
VIA METROPOLITAN TRANSIT,  )
                           )
        Defendant.         )
                           )
_____

ORAL AND VIDEOTAPED DEPOSITION OF
DEBRA SANTACRUZ
JUNE 15, 2022
_____

ORAL AND VIDEOTAPED DEPOSITION OF DEBRA SANTACRUZ,
produced as a witness at the instance of the Defendant,
and duly sworn, was taken in the above-styled and
numbered cause on June 15, 2022, from 9:34 a.m. to 3:22
p.m., before Deborah A.G. Davidson, CSR, RPR, in and for
the State of Texas, reported by machine shorthand, at
the Law Offices of Dykema Gossett, PLLC, 112 East Pecan
Street, Suite 1800, San Antonio, Texas 78205, pursuant
to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

**Page 2**

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:
    Mr. Thomas J. Crane
    LAW OFFICE OF THOMAS J. CRANE
    900 N.E. Loop 410
    Suite D306
    San Antonio, Texas 78209
    Phone: (210) 736-1110
    tom@cranelawyer.net

FOR THE DEFENDANT:
    Ms. Donna K. McElroy
    Ms. Katherine A. Zampas
    DYKEMA COX SMITH
    112 East Pecan
    Suite 1800
    San Antonio, Texas 78205
    Phone: (210) 554-5500
    dmcelroy@dykema.com
    kzampas@dykema.com

ALSO PRESENT:

    Norman Longoria;

    Kris Perez,
        The Videographer;
    Debra Santacruz,
        The Witness;

    Deborah Davidson,
        Certified Shorthand Reporter.

**Page 3**

I-N-D-E-X

PAGE

17

1    Q. Boy or girl?
2    A. A girl.
3    Q. How old is she?
4    A. She is 35.
5    Q. Have you ever been arrested or convicted of a
6  crime?
7    A. No.
8    Q. Have you ever filed for bankruptcy?
9    A. No. No. Yes, I have. Yes, I have. I'm
10 sorry.
11    Q. When did you do that?
12    A. Let's see. I was working with VIA at the time.
13 I'm -- I don't remember the year.
14    Q. Does 2015 sound about right?
15    A. I'm -- I'm not sure to be honest.
16    Q. Okay. Did you file a Chapter 7 or a
17 Chapter 13?
18    A. 13. I paid it back. It was taken out of my
19 pay.
20    Q. So there was a payroll deduction through VIA?
21    A. Yes.
22    Q. So we can probably figure out the date for
23 that --
24    A. Yes.
25    Q. -- those records?

18

1    A. Yes, ma'am.
2    Q. So you began working for -- for V -- VIA in --
3  in 2001; is that correct?
4    A. Yes, ma'am.
5    Q. And you began as a part-time employee, correct?
6    A. Yes.
7    Q. And you work as a part-time employee for about
8  15 years, correct?
9    A. Yes.
10    Q. All right. And your position at VIA was a
11 paratransit reservation agent, correct?
12    A. Yes.
13    Q. And you transitioned to -- to a full-time
14 employee -- employee after you had worked 15 years as a
15 part-time employee, correct?
16    A. Yes.
17        (Exhibit 1 marked.)
18    Q. (BY MS. MCELROY) Now, I'm handing you what I'm
19 marking as Exhibit No. 1 to your deposition.
20        MS. MCELROY: Tom, I don't mean -- it's --
21        MR. CRANE: Thank you.
22    Q. (BY MS. MCELROY) This is -- this was your job
23 description when you worked at VIA as a paratransit
24 reservation agent, correct?
25    A. Yes.

19

1    Q. And this job description outlines what your
2  duties and responsibilities were in that role, correct?
3    A. Yes.
4    Q. And it makes clear that part of your job was to
5  communicate with disabled customers regarding their
6  schedules, routes, trip requests and reservations,
7  correct?
8    A. Yes.
9    Q. And it was an important part of your job to
10 timely answer those customer calls, correct?
11    A. Yes.
12    Q. And your communications were limited to
13 customers who needed special accommodations because of
14 their disabilities, correct?
15    A. Yes.
16    Q. And -- and part of your job description was to
17 maintain a good work attendance, correct?
18    A. Yes.
19    Q. And so you understood that all of the duties
20 outlined here in Deposition Exhibit 1 were requirements
21 of your position while you worked at VIA; is that right?
22    A. Yes.
23    Q. Now, while you were at VIA you were also aware
24 that the company had policies that governed employee
25 behavior, correct?

20

1    A. Yes.
2    Q. All right. And you were aware that you were
3  required to follow those policies, correct?
4    A. Yes.
5    Q. And you received copies of those policies
6  during your employment at VIA, correct?
7    A. Yes.
8    Q. All right. And including in that -- that, you
9  were aware that you were an at-will employee at VIA; is
10 that right?
11    A. Yes.
12    Q. So you didn't have a contract of employment?
13    A. No.
14    Q. Okay. And you were also aware that as part of
15 VIA's policies and procedures they prohibited
16 discrimination and harassment based on sex, race,
17 disability or any other protected class, correct?
18    A. That's what it said. Yes.
19        (Exhibit 2 marked.)
20    Q. (BY MS. MCELROY) Okay. And I will mark now
21 Exhibit No. 2 to your deposition. I'm sorry to have to
22 slide them over. I just can't -- my arms aren't that
23 long. And this was a -- this is a copy of the Equal
24 Employment Opportunity Policy that was in effect when
25 you were an employee at VIA, correct?

21

1    A. Yes.

2    Q. And this policy instructs you as to how to

3  bring a complaint of discrimination or harassment or

4  retaliation if -- if you believe that was happening at

5  VIA, correct?

6    A. Yes.

7      MS. MCELROY: That's okay.

8      (Exhibit 3 marked.)

9    Q. (BY MS. MCELROY) I'm going to hand you what

10  I'm marking as Exhibit No. 3 to your deposition. This

11  was the Americans With Disabilities Act policy that was

12  in effect when you were employed at VIA, correct?

13    A. Yes.

14    Q. And you were aware that this policy was in

15  place when you were at -- at VIA, right?

16    A. Yes.

17    Q. And the policy specifically tells employees who

18  are disabled and require accommodations may contact the

19  Human Resources Division. Did I read that correctly?

20    A. Yes.

21    Q. And you were aware of this -- this provision as

22  well, correct, while you were at VIA?

23    A. Yes and no. If I could explain. We didn't

24  really go by this. This may have been in the book, but

25  we did not go by this.

22

1    Q. When you say, "We did not go by this," who are

2  you talking --

3    A. Other employees.

4    Q. Okay. What did you go by?

5    A. We would go to the office. We would talk with

6  Blanca and Gloria, and then they would tell us what we

7  needed to do from there. Then we would get in touch

8  usually back then it was with Sergio.

9    Q. And Sergio was in charge of -- of

10  accommodations?

11    A. Of FMLA. Yes.

12    Q. Well, I'm not talking about the FMLA.

13    A. Okay.

14    Q. I'm talking about the Americans with

15  Disabilities Act. Not -- not FMLA. So I want to --

16    A. Uh-huh.

17    Q. -- make that very --

18    A. Okay. I'm --

19    Q. -- very clear.

20    A. Okay.

21    Q. So if you needed an accommodation under the

22  Americans with Disabilities Act --

23    A. Uh-huh.

24    Q. -- the policy said you could contact the Human

25  Resource Division, correct?

23

1    A. Correct.

2    Q. Okay. So --

3    A. We did not do that --

4    Q. Okay.

5    A. -- to my knowledge.

6    Q. To your knowledge?

7    A. Yes, ma'am.

8    Q. So you didn't -- but you don't know what other

9  employees did, do you?

10    A. Well, I -- just to -- Cruz. Her name was Cruz,

11  and she was the one who had told me about it, But I --

12    Q. Told you about what?

13    A. Just about our rules. We were -- we had just

14  talked about it one day. So --

15    Q. This -- was Cruz a -- a supervisor?

16    A. No. No. She was just an agent.

17    Q. Okay. So -- all right. So Cruz -- Cruz told

18  you some things about -- about the ADA?

19    A. Yes.

20    Q. Okay. And --

21    A. It was --

22    Q. -- when was that?

23    A. -- with just her situation.

24    Q. About her own personal situation?

25    A. Yes. I --

24

1    Q. Okay.

2    A. I was still part time. We --

3    Q. So that was a long time ago?

4    A. Right. We did not read our employee handbook.

5    Q. So you said -- so you said, "we". And so

6  was -- was it just Cruz you were talking about?

7    A. Other agents that I spoke to. Like I say, I

8  was part time at that time.

9    Q. Okay. So when you were part time you spoke

10  with other agents about rules around the Americans with

11  Disabilities Act?

12    A. Yes. Sometimes they would talk about that in

13  the lunchroom.

14    Q. Okay. And that's the only time you had those

15  conversations?

16    A. Yes, ma'am.

17    Q. You never went to the ADA manager, David --

18  David Frost to request an accommodation, did you?

19    A. No.

20    Q. Okay. Now the paratransit department at VIA

21  also had an attendance policy, correct?

22    A. Yes.

23    Q. And that policy would define various

24  absences -- absences that set out the standard procedure

25  for accrual of attendance points?

29

1    Q. Okay. Do you know who Belinda Guzman allegedly
2  sent the E-mail to?
3    A. Well, the one that she sent, she sent me an
4  E-mail at -- questioning about the time -- the days I
5  had taken off.
6    Q. Right. But no. We -- what -- listen to my
7  question. In your discovery in this case --
8    A. Yes.
9    Q. -- you have indicated that Guzman sent an
10 E-mail about a new process. Not questioning you
11 individually, but about a new process. Are you certain
12 that --
13   A. This -- this is it. Yes, ma'am.
14   Q. Okay.
15   A. Yes, ma'am.
16   Q. That's what I'm trying to confirm.
17   A. Yes, ma'am. Yes, ma'am.
18   Q. So -- so Deposition Exhibit No. 5 is the E-mail
19 you were referring to that talked about a new process?
20   A. Yes.
21   Q. Okay. And you don't have any personal
22 knowledge of whether Blanca Dominguez had anything to do
23 with this new process, do you?
24   A. Before this E-mail was sent, Blanca had said
25 she -- that things were going to change. She had told

30

1  us that, and she had send us an E-mail previous to this
2  one stating that things were going to change and it was
3  going to be hard for some of us.
4        MS. MCELROY: Okay. Let me object to the
5  responsiveness of the answer.
6    Q. (BY MS. MCELROY) My question is this, ma'am.
7  As far as you know Blanca Dominguez didn't have the
8  authority to change the policy herself, correct?
9    A. Correct.
10   Q. Somebody else above her did that, correct?
11   A. Correct.
12   Q. And she was just informing you about what was
13 coming?
14   A. Correct.
15   Q. So in addition to the extension of your
16 original probationary period because of your tardies
17 problem, you were also put on probation in -- while you
18 were working part time again for dis -- for attendance
19 issues, right?
20   A. Right.
21       MS. MCELROY: Yeah. Just have -- six.
22 That's seven.
23       (Exhibit 6 marked.)
24   Q. (BY MS. MCELROY) I'm going to hand you what
25 I'm marking as Exhibit No. 6 to your deposition. This

31

1  was a written reminder you were given to address your
2  unacceptable attendance, correct?
3    A. Correct.
4    Q. And that's your signature on the second page?
5    A. Yes.
6        (Exhibit 7 marked.)
7    Q. (BY MS. MCELROY) I will mark Deposition
8  Exhibit No. 7. This is also another -- this is when you
9  were put on probation because of your attendance
10 problems, correct?
11   A. Yes.
12   Q. And that's your signature that appears on the
13 bottom of Deposition Exhibit No. 7?
14   A. Yes.
15       MS. ZAMPAS: Eight.
16       (Exhibit 8 marked.)
17   Q. (BY MS. MCELROY) Deposition Exhibit No. 8.
18 This is again another warning to you about your
19 attendance issues, correct?
20   A. Yes.
21   Q. And that's your signature which appears on the
22 second page of Deposition Exhibit No. 7?
23   A. Yes.
24       (Exhibit 9 marked.)
25       MS. MCELROY: What's that?

32

1        MS. ZAMPAS: I think I gave you too many.
2    Q. (BY MS. MCELROY) Deposition Exhibit No. 9.
3  This is another written reminder that you received
4  because you had eight attendance points in -- in January
5  of 2019, correct?
6    A. Correct.
7    Q. And so you were aware as of January 18th, 2019,
8  that you were accruing attendance points that could lead
9  to your discipline, correct?
10   A. Yes.
11   Q. And this is your signature which appears on
12 Deposition Exhibit No. 9?
13   A. Yes.
14       (Exhibit 10 marked.)
15   Q. (BY MS. MCELROY) I'm going to hand you
16 Deposition Exhibit No. 10. Now, this is another warning
17 you received where now you had ten attendance points,
18 correct?
19   A. Correct.
20   Q. And so you received that in -- on March 9th,
21 2019, correct.
22   A. Correct.
23   Q. And that's your signature which appears on the
24 bottom of that document, correct?
25   A. Correct.

33

1   Q. And this shows you the number of times that you
2   called in and -- and what happened and --
3       MS. MCELROY: God bless you.
4       MR. CRANE: Bless you.
5   Q. (BY MS. MCELROY) The number of times you
6   called -- called in or logged in and out at certain
7   times, correct?
8   A. Correct.
9   Q. So when you received this warning of the ten
10  attendance points, did you know how many attendance
11  points you could accrue before you would be considered
12  for termination?
13  A. Yes.
14  Q. Okay. And what -- what was that number?
15  A. For termination it was 14 points.
16  Q. And how did you know that?
17  A. We were told.
18  Q. Okay. Told by Blanca?
19  A. Blanca.
20  Q. Okay.
21  A. Yes, ma'am.
22  Q. Do you remember when she told you that?
23  A. In January.
24  Q. January of what year?
25  A. Of 2019.

34

1   Q. When -- when you -- did she tell you that when
2   she gave you your attendance reminder when you had the
3   eight points or before?
4   A. When I had the eight points.
5   Q. So when you -- she met with you on
6   January 18th, 2019, she informed you that you -- you had
7   a max limit of 14 points?
8   A. Yes, ma'am.
9   Q. So when you -- as of April 2019, you had been a
10  full-time employee for -- for VIA for about three years;
11  is that right?
12  A. Yes.
13  Q. And then on Friday, April the 19th, you failed
14  to report to work and did not speak with Blanca
15  Dominguez on that day, correct?
16  A. I spoke to Gloria.
17  Q. Okay. That's -- my question is --
18  A. Yes.
19  Q. Okay.
20  A. That's correct.
21  Q. You did not speak to Blanca Dominguez on
22  April 19th, 2019, correct?
23  A. Correct. I did leave a voice mail on Blanca's
24  phone.
25  Q. But you didn't speak to her?

35

1   A. No.
2   Q. And you then worked on Saturday, April the
3   20 -- 20th, right?
4   A. Yes.
5   Q. And you worked a full shift?
6   A. Yes.
7   Q. And nobody -- and that was the last day you
8   worked at VIA, correct?
9   A. Yes.
10  Q. And no one on that day told you you had been
11  terminated, correct?
12  A. Correct.
13  Q. Now on Monday, April the 22nd, you did speak to
14  Blanca Dominguez, correct?
15  A. Yes.
16  Q. And at that time you requested that she
17  complete forms for you to withdraw your retirement
18  funds, correct?
19  A. That was one of the last calls, yes.
20  Q. One of the last calls on -- how many times did
21  you speak to her on April 22nd?
22  A. When -- two to three times. The third time if
23  she would have answered, but she had hung up on me. So
24  I didn't speak to her --
25  Q. So did you --

36

1   A. -- on the third one.
2   Q. So did you speak to her once or twice?
3   A. Twice.
4   Q. Okay. And so tell me about the first phone
5   call.
6   A. The first one I had called her and told her
7   that Gloria had told me to call her and ask her if I was
8   going to be able to go to work tomorrow.
9   Q. Why did Gloria tell you that?
10  A. Because when I went to work with Gloria on
11  Saturday she told me that she didn't know if Blanca had
12  fired me yet and to call to make sure I wasn't
13  terminated.
14  Q. And Gloria is not a supervisor, correct?
15  A. She was a lead agent.
16  Q. But she wasn't a supervisor, correct?
17  A. No.
18  Q. And she didn't have the authority to make
19  employment decisions as far as you know, correct?
20  A. Correct.
21  Q. All right. And you don't know if Gloria had
22  spoken to Blanca, correct?
23  A. Correct.
24  Q. Okay. So Gloria told you to do that. So you
25  called her and you -- you asked her that, and what was

37

1   her response?
2       A.  She was upset.  She was tired of -- she used
3   the word "shit."  She was tired of my shit and that she
4   was going to let Daniel know that she had terminated me.
5       Q.  Do you have personal knowledge as to whether
6   Blanca Dominguez has any authority at VIA to fire
7   anyone?
8       A.  At that time I believed she did.
9       Q.  Do you know if -- do you have any personal
10  knowledge of whether Blanca Dominguez had authority to
11  fire anybody at VIA?
12      A.  She had fired my friend to my knowledge.  So I
13  thought so.
14      Q.  Well, your friend told you that, correct?
15      A.  It -- she walked out of the office, yes, and
16  told everybody.  Yes.
17      Q.  Right.  So you weren't present when that
18  happened, were you?
19      A.  Inside the office, no.
20      Q.  Okay.  So you -- the only knowledge you have of
21  what happened to your friend -- I know you're talking
22  about Norma Garcia?
23      A.  Yes, ma'am.
24      Q.  The only knowledge you have about what happened
25  with Norma Garcia is what Norma Garcia told you,

38

1   correct?
2       A.  Correct.
3       Q.  All right.  So, again, you don't have any
4   personal knowledge of whether Blanca Garcia -- Blanca
5   Dominguez, excuse me, had any authority to fire anybody
6   at VIA, correct?
7       A.  I didn't see it happen.
8       Q.  Okay.  Right.  So you have no personal
9   knowledge of what her authority is -- was, do you?
10      A.  That's hard to answer.
11      Q.  Well, do you have any personal knowledge of the
12  process that VIA follows before it terminates someone?
13      A.  Now I do.
14      Q.  Do you -- you don't have any personal
15  knowledge, do you?
16      A.  No.
17      Q.  Personal --
18      A.  No.  No.  No.
19      Q.  -- knowledge --
20      A.  No, I didn't see it happen.  No.
21      Q.  Okay.  You weren't there?
22      A.  Right.
23      Q.  It wasn't part of your job duties?
24      A.  Right.
25      Q.  Okay.  So you don't know what process anyone

39

1   was -- is required to follow at VIA in order to
2   terminate an employee, do you?
3       A.  That's correct.
4       Q.  Okay.  So you had this call with her and then
5   what happened?  She said -- you say she said she was --
6   she was tired of your shit?
7       A.  Yes.
8       Q.  Then what happened?
9       A.  And told me I was terminated and she was going
10  to let Daniel know as soon as he got back into town.
11      Q.  Okay.  And then what happened?  What else
12  happened at that call?
13      A.  I asked her how could she do that and if it
14  meant I was fired.  I didn't believe it.  So I wanted to
15  confirm.  She said yes, I was, and then she hung up on
16  me.
17      Q.  And did you call her back?
18      A.  Yes.
19      Q.  And what did you talk about in the second call?
20      A.  Well, that -- she texted then and she told me
21  to stop harassing her.
22      Q.  Well, did you have a second call or was it just
23  a text message exchange?
24      A.  It was text messages after.
25      Q.  Okay.  So let's make sure the record is clear.

40

1   You spoke to her one time on April 22nd, 2019, correct?
2       A.  Yes.
3       Q.  And then you exchanged text messages?
4       A.  The texts were the second.  Yes.
5       Q.  Correct?
6       A.  Correct.
7       Q.  And we looked at those text messages yesterday
8   in her deposition.  You present for that, remember?
9       A.  Yes.  But they were not all there.
10      Q.  Okay.  Well, we'll get -- we'll talk about
11  that.
12      A.  Okay.
13      Q.  Do you have those text messages?
14      A.  No, I don't.
15      Q.  So in the first call, the only call you had
16  with Blanca Dominguez on April 22nd, you asked her to
17  complete forms for you to withdraw your retirement
18  funds?
19      A.  No.  I did not.
20      Q.  Were you looking to withdraw your retirement
21  funds?
22      A.  When I was fired, yes.
23      Q.  Well, no one -- let me -- well, let me back up.
24  During this time period you were contacting individuals
25  at VIA to try to withdraw your retirement funds,

41

1 correct?
2     A. I believe that was the next day.
3     Q. Okay.
4     A. Yes.
5     Q. And how much was in your retirement funds?
6     A. I'm -- I'm not sure. I'm not sure.
7     Q. You don't -- do you have an approximate amount
8 that was in there?
9     A. No. It -- it wasn't that much. I'm really not
10 sure. I don't want to say something I'm not sure about.
11         MS. ZAMPAS: There's a copy for you.
12         MS. MCELROY: Okay.
13         (Exhibit 11 marked.)
14     Q. (BY MS. MCELROY) I'm handing you what I'm
15 marking as Deposition Exhibit No. 11. Are these the
16 text messages you exchanged on April 23rd?
17     A. The first one that says, My sister's giving me
18 a ride. I can still go in. That was definitely not on
19 the 20 -- let's see. That was definitely not on the
20 23rd.
21     Q. Other than that, are these the text messages
22 that you exchanged on the 23rd -- April 23rd, 2019?
23     A. Just a moment.
24     Q. Okay.
25     A. I believe so. Yes.

42

1     Q. Okay. And if you will see on the first page of
2 Deposition Exhibit No. 11, down at the bottom little
3 bubble there it says, Once it's determined that you will
4 be terminated, then you will need to sign the leave of
5 service report. Do you see that?
6     A. On the first page you said?
7     Q. Yes, ma'am. In the -- in the middle of that --
8 that -- the -- the --
9     A. Okay. Yes, I do. Yes, I do.
10     Q. You see that?
11     A. Yes.
12     Q. And so that's what Blanca was telling you on
13 April 23rd, 2019, correct?
14     A. Yes.
15     Q. Then she goes on to say, I'm sorry, but as
16 of -- but you are not officially terminated as of right
17 now, correct?
18     A. Correct.
19     Q. So nowhere in these text messages did she tell
20 you you had been terminated, did she?
21     A. She had said it to me on the phone. Not in the
22 text messages. On the phone.
23         MS. MCELROY: Well, let me object to the
24 responsiveness of the answer.
25     Q. (BY MS. MCELROY) Nowhere in these text messages

43

1 did she tell you you had been terminated, correct?
2     A. Correct.
3     Q. And in fact she said you have not been
4 officially terminated, correct?
5     A. Correct.
6     Q. And did you talk to Sylvia about trying to get
7 your retirement funds?
8     A. It came up, yes.
9     Q. And did she tell you that the -- the quickest
10 way to get your retirement funds would be to resign?
11     A. Yes, she did.
12     Q. And she told you that April 23rd?
13     A. Yes.
14     Q. And you decided you were not going to resign,
15 correct?
16     A. Correct. I had not resigned.
17         MR. CRANE: Is this a good time to take a
18 quick break?
19         MS. MCELROY: Let me just -- let me finish
20 here and we will.
21     Q. (BY MS. MCELROY) And if you look at the last
22 page of Deposition Exhibit No. 11, you asked -- you ask
23 Blanca again, So am I fired or not? And she tells you,
24 No, and if you need to leave right away resigning is the
25 way to go, correct?

44

1     A. Yes.
2     Q. Because you were asking her to prepare a letter
3 that would allow you to withdraw your retirement funds,
4 correct?
5     A. Correct.
6     Q. And you couldn't withdraw those retirement
7 funds unless you were no longer working for VIA,
8 correct?
9     A. Correct.
10     Q. Why would Ms. Castillo tell you to resign if
11 you -- if she had terminated you?
12     A. Because she didn't know.
13     Q. She didn't know what?
14     A. Anything.
15     Q. She didn't know anything about what?
16     A. When I called Ms. Castillo to ask her, she
17 didn't know I had tardies. She didn't know anything and
18 that's what she told me, that she did not know anything.
19 She would have to speak to Ms. Dominguez.
20     Q. Okay. So it was clear in your conversation
21 with Ms. Castillo she had not approved your termination,
22 correct?
23     A. Correct.
24     Q. After speaking with Ms. Castillo and
25 Ms. Dominguez, did you call Dan -- Daniel Chaipan?

45

1    A. Yes, I did.
2    Q. What did you discuss during that call?
3    A. If I was really fired.
4    Q. What did he tell you?
5    A. He said that if Blanca said I was, then I was.
6    Q. Was anybody else on that call?
7    A. No.
8    Q. When did you call him?
9    A. I know I had tried that day, the day it all
10   happened, but I think I didn't get ahold of him until
11   the next day.
12   Q. But would that be the 24th?
13   A. No.  That would be the 23rd.
14   Q. The 23rd?
15   A. Yes, ma'am.
16   Q. So the same day as these text messages?
17   A. Yes, ma'am.
18   Q. Where Blanca is telling you you had not been
19   terminated, correct?
20   A. Yes, ma'am.
21   Q. And -- but you also said that Mr. Chaipan told
22   you you could come back and finish your pay period?
23   A. Yes.
24   Q. Okay.  And he also told you failure to report
25   to work would constitute job abandonment?

46

1    A. No.
2    Q. He never said that?
3    A. He did not say that.
4    Q. And so even though he said you could come back
5    and finish your pay period, you chose not to do that,
6    correct?
7    A. Correct.
8    Q. Why would he tell you you could come back and
9    finish your pay period if you had been terminated?
10   A. Because we were shorthanded.
11   Q. Is that what you -- that's what you thought or
12   did he say that?
13   A. No.  That's what I assumed.
14   Q. Okay.  And --
15        MS. MCELROY:  We could take a break now.
16   Sorry.
17        MR. CRANE:  Okay.  Thanks.
18        THE WITNESS:  Okay.
19        THE VIDEOGRAPHER:  The time is 10:24 a.m.
20   and we are off record.
21        (Recess from 10:24 a.m. to 10:35 a.m.)
22        THE VIDEOGRAPHER:  Okay.  The time is
23   10:35 a.m. and we are on record.
24   Q. (BY MS. MCELROY) Ms. Santacruz, are you ready
25   to proceed?

47

1    A. Yes, ma'am.
2    Q. Okay.
3    A. I wanted to go back to something --
4    Q. Hold -- hold on.
5    A. -- if I could.
6    Q. You want to go back to something?
7    A. Yes, ma'am.
8    Q. What did you want to go back to?
9    A. Right here to our employee handbook.
10   Q. What are you -- what are you pointing at?
11        MR. CRANE:  Which exhibit?
12        THE WITNESS:  Is -- it's --
13        MR. CRANE:  It looks like Exhibit No. 4?
14        THE WITNESS:  Yes.
15   Q. (BY MS. MCELROY) Depo -- Deposition Exhibit
16   No. 4?
17   A. Yes, ma'am.
18   Q. Hang on just a second.  So you want to go back
19   to the attendance policy?
20   A. Yes.
21   Q. Okay.  And what is it that you want to say
22   about the attendance policy?
23   A. Okay.  For -- this is an example for
24   Eligible-to-Work Rules For Overtime, even though it's a
25   rule and it's in the -- in the employee handbook --

48

1    Q. Where --
2    A. -- this --
3    Q. Where are you reading?  I'm sorry.
4    A. Four.  Eligible to --
5    Q. Okay.  I got you.
6    A. Okay.  This was never and still isn't put into
7    place where you had to have a break from working because
8    a lot of employees work double shifts.  So this is not
9    true and we did not go by it.  So for the attendance we
10   didn't go by any of this until 2019.
11   Q. And by -- and by "any of this," you're point --
12   you're talking about page --
13   A. The rules --
14   Q. -- what?
15   A. -- on the --
16   Q. Hang on.  Hang on.  Let me finish.  You're
17   talking about the eligible rules to work overtime on
18   Deposition Exhibit No. 4, correct?
19   A. Correct.
20   Q. And you didn't do any of this until 2019,
21   correct?
22   A. Correct.
23   Q. Because this was a new policy at that time,
24   correct?
25   A. Correct.

49

1    Q. All right. And you decided you needed to -- to
2  correct this after you had a conversation with your
3  lawyer?
4    A. No.
5    Q. Well, did you have a conversation with your
6  lawyer when we took a break?
7        MR. CRANE: Objection. Don't answer that
8  question.
9    Q. (BY MS. MCELROY) Did you have a conversation
10  with your lawyer when we took a break?
11        MR. CRANE: Don't --
12    Q. (BY MS. MCELROY) I'm not asking you what you
13  discussed. Did you have a conversation with your lawyer
14  when you took a break?
15    A. I don't have to answer that.
16    Q. Are you -- I'm asking you if you talked to your
17  lawyer?
18        MR. CRANE: You can -- you can tell her we
19  had a conversation.
20        THE WITNESS: Yes.
21    Q. (BY MS. MCELROY) Okay. Now getting back to
22  what we were talking about before the break was taken,
23  when you were talking to Daniel Chaipan it was clear to
24  you he hadn't approved your termination either, correct?
25    A. It wasn't clear to me.

50

1    Q. Well, it -- was it clear that he had not talked
2  to Blanca?
3    A. That was clear. He had not spoken to Blanca.
4    Q. Okay. So -- but you didn't know if he had
5  approved anything or not, did you?
6    A. He said whatever Blanca said. So whatever
7  Blanca said was it.
8    Q. But you don't know if he had actually formally
9  approved your termination, do you?
10    A. Correct.
11    Q. And isn't it true you needed your money out of
12  your retirement account and you wanted VIA to terminate
13  you?
14    A. No.
15    Q. Isn't it also true you assumed that you had
16  been terminated because you know -- knew that you -- or
17  believed that you had -- had 14 points, correct?
18    A. No.
19    Q. Didn't you believe you had 14 points?
20    A. Yes.
21    Q. Okay. And you knew that was the level at which
22  you could be terminated under the attendance policy
23  which has been mark -- marked as Deposition Exhibit --
24  Exhibit No. 4, correct?
25    A. It had been changed before. Yes.

51

1    Q. Okay. Let me make sure the question is right
2  on the record. You knew that 14 points was the level
3  for termination because that was in accordance with the
4  attendance policy, correct?
5    A. Yes.
6    Q. And the attendance policy has been marked as
7  Deposition Exhibit No. 4?
8    A. Yes.
9    Q. Okay. Did you -- you never contacted anybody
10  in human resources to review your situation, did you?
11    A. No.
12    Q. Now you have claimed in this case that you have
13  a disability. What is your disability?
14    A. My back.
15    Q. What about your back?
16    A. I had a tailbone fracture previous and it was
17  just a hairline fracture. So I was okay when I was part
18  time. As I went full time, the longer I would sit, the
19  more I'd have problems with it. So I went to the doctor
20  and he's the one who told me that I needed to get up and
21  move around.
22    Q. When did you have that fracture?
23    A. Let's see. I believe it was right before I had
24  gone full time. It was maybe a year or so. About 2014,
25  maybe. I'm estimating.

52

1    Q. Did you have an accident or --
2    A. I had fallen.
3    Q. And did you ever request an accommodation from
4  VIA?
5    A. When I turned in the notes, yes.
6    Q. When you turned in what notes?
7    A. My FMLA papers in 2016.
8    Q. Well, you turned in a request for FMLA leave,
9  correct?
10    A. Yes.
11    Q. Okay. And that was granted, correct?
12    A. Correct.
13    Q. And you told me before that every -- all of
14  your requests for FMLA were granted and you were able to
15  take that leave, correct?
16    A. Correct.
17    Q. All right. And so outside of turning in FMLA
18  paperwork, did you ever request any other accomodation
19  from VIA?
20    A. Verbally, yes, between me and Blanca and
21  Gloria.
22    Q. Well, Gloria doesn't have the authority to
23  grant accommodations, does she?
24    A. It's hard to say because there at work when
25  Gloria said something, it was usually because she had

53

1  gotten it okayed with Blanca.

2     Q. And that was your assumption, correct?

3     A. When we would go in together, yes.

4     Q. Okay.

5     A. We would talk, yes.

6     Q. And when you say, "go in together," did you

7  ride the bus to work together?

8     A. Yes. Me and Gloria.

9     Q. What accommodation did you request from Gloria?

10    A. To get up and be able to walk around every two

11 hours or so.

12    Q. Okay. And what did she -- what was her

13 response to that?

14    A. She said that was no problem unless the queue

15 was high.

16    Q. Okay. How many times did you have that

17 conversation with her?

18    A. It's hard to say. More than three times.

19    Q. Why did you have it more than three times if

20 she said it was okay for you to do it?

21    A. I wasn't sure if she had okayed it with Blanca.

22    Q. Okay. And did she ever -- what did -- what did

23 she tell you about -- did she ever -- did you ever ask

24 her if she okayed it with Blanca?

25    A. Yes.

54

1     Q. And what did she tell you Blanca said?

2     A. She said the first couple of times she was

3  going to talk to her, but she hadn't yet. That's why it

4  was about three times or more that I did tell her. Then

5  once I was told that Blanca said it was okay, then it

6  was okay.

7     Q. Then you didn't talk about it anymore?

8     A. Correct.

9     Q. So you didn't have that conversation directly

10 with Blanca. It was relayed through Gloria; is that

11 correct?

12    A. Yes.

13    Q. Okay. Did you ever have any direct

14 conversations with Blanca about an accommodation need?

15    A. We would talk about it in the office, yes.

16    Q. What -- what conversations did you have with

17 Blanca?

18    A. Gloria would tell her, you know, that I -- my

19 back was hurting so that I would probably be getting up

20 more often.

21    Q. But -- but Gloria was relaying that to Blanca?

22    A. Well, we were all in the office. So it was in

23 front of me. All three of us were in the office.

24    Q. Was it just the three of you?

25    A. Yes.

55

1     Q. And what office were you in?

2     A. Blanca's.

3     Q. Okay. And then did Blanca approve it?

4     A. Yes.

5     Q. So as -- is that the only disability that you

6  have?

7     A. And my vision. The lights bother me.

8     Q. Didn't you tell the E.E.O.C. that you didn't

9  have a disability as it relates to your vision?

10    A. I -- I did not know. I would get migraines,

11 and I had already been at VIA when they send me to the

12 doctors and that's when I found out.

13         MS. MCELROY: I'm going to object to the

14 responsiveness of the answer.

15    Q. (BY MS. MCELROY) When you interview -- do you

16 remember having an intake interview with an E.E.O.C.

17 agent?

18    A. No, I don't.

19    Q. Okay. We'll get to that in a minute. What

20 limitations does this disability have -- well, let me

21 back up. On your -- on your vision, VIA also

22 accommodated that, correct?

23    A. Yes.

24    Q. And they did several -- made several changes to

25 your workstation in order to accommodate you, correct?

56

1     A. No. I did it myself. I changed my screen

2  colors and that helped a lot.

3     Q. Didn't they give you permission to wear

4  sunglasses?

5     A. Yes.

6     Q. And didn't they adjust the lighting over your

7  head?

8     A. No.

9     Q. Didn't they -- so they -- they -- they did

10 accommodate you at least by via the sunglasses, correct?

11    A. Yes.

12    Q. All right. And what limitations, if any, do

13 any -- do either of these disabilities cause in your

14 daily life?

15    A. The vision none because I can use glasses or

16 adjust my screen.

17    Q. And what about the back?

18    A. The back it -- I'm fine as long as I can move a

19 little. Like I can't sit for four hours straight

20 without getting up. I need to at least stand up or

21 stretch.

22    Q. Okay. So you're able to care for yourself?

23    A. Yes.

24    Q. Okay. And you can perform manual tasks?

25    A. Yes.

57

1    Q. During this time at VIA you were able to get to
2  and from work on your own?
3    A. Yes.
4    Q. Okay. How -- and during 2018 or 2019, how did
5  you get to work?
6    A. With Gloria.
7    Q. How?
8    A. The VIAtrans picked us up.
9    Q. Okay. And did you have a car during this time?
10   A. No.
11   Q. Were you having financial difficulties such
12 that you couldn't afford a car?
13   A. No. I had -- I had one. I lost it. I wasn't
14 worried about getting a car at that point.
15   Q. How did you lose -- how did you lose your car?
16   A. I couldn't -- it had been towed and I couldn't
17 get it out of the area. I -- I was given
18 misinformation. I did not check it out for myself,
19 which I had longer than two days. That's the bottom
20 line. I thought I had only two days. Turned out I had
21 two weeks, but I believed when I made the call. So I
22 just lost it.
23   Q. So did you not have money to get it out in the
24 two-day period?
25   A. No. That was -- no. I did not.

58

1    Q. You did not?
2    A. I did not.
3    Q. Okay. So because you didn't have the money to
4  get your car out of the tow lot, you lost it?
5    A. Yes.
6    Q. Is that accurate?
7    A. That's accurate.
8    Q. So during this time, 2018, 2019, were you
9  physically able to drive?
10   A. Yes.
11   Q. And physically able to work?
12   A. Yes.
13   Q. So it sounds to me like aside from having to
14 get up once every four hours and walk around, you could
15 perform all of your job duties, correct?
16   A. Yes.
17   Q. And was it -- were the only accommodations you
18 requested the accommodation relating to your eyes and
19 the ability to get up every four hours and stand up --
20 stand up?
21   A. Yes. It was every two to four hours.
22   Q. And those were the only accommodations,
23 correct?
24   A. Yes.
25   Q. Did you ever make any of these accommodation

59

1  requests in writing?
2    A. No.
3    Q. And you had a VariDesk while you were at VIA,
4  correct?
5    A. Towards the last year, yes.
6    Q. And that -- that VariDesk allowed you to stand
7  up or sit down to perform your duties, correct?
8    A. Yes.
9    Q. And so would stand -- standing up help relieve
10 your back pain?
11   A. For a little bit, yes.
12   Q. Okay. And did these accommodations ever
13 change?
14   A. No.
15   Q. Are you aware, ma'am, that the -- the job --
16 part of the job duties of the lead reservation agent was
17 to make sure all agents were not off the phones for
18 extended periods of time?
19   A. Yes.
20   Q. So it was their job -- the lead reservation
21 agent's job duties included monitoring all of the
22 reservation agents, correct?
23   A. Yes. That wasn't always done though, but yes.
24   Q. As far as you know it was part of their job
25 duties?

60

1    A. Yes.
2    Q. And you don't -- you didn't supervise the lead
3  reservation agents, correct?
4    A. Rephrase.
5    Q. You had no supervisory responsibility over the
6  lead reservations agents, correct?
7    A. That's correct.
8    Q. And when you say -- what wasn't always done?
9  You said, "that wasn't always done"?
10   A. Well, some of us were watched more than others.
11   Q. How do you know that?
12   A. It was obvious. We would have a -- a high
13 queue, but if you were one of the favorites you could be
14 talking about personal life with the leads, with Gloria
15 and Blanca, if Blanca was outside there, which she was
16 lots of times, and the rest of us would be call, after
17 call, after call, after call, and they would be laughing
18 or talking.
19   Q. Who --
20   A. So --
21   Q. -- were the favorites?
22   A. Taylor Fernandez, Lena. I -- I don't remember
23 Lena's last name. Let's see. Taylor was the main one.
24 Susie sometimes, but Susie didn't take advantage. The
25 main one was Taylor. It was usually Taylor, Gloria, and

61

1 Blanca.
2     Q.  So it was Taylor, Gloria, and Blanca?
3     A.  Yes.
4     Q.  And then the -- other agents, including
5 yourself, were --
6     A.  And Elia was an agent as well.
7     Q.  What -- what about Elia?
8     A.  They would do the same thing.  They'd all be
9 talking, laughing, while only some of us were working.
10     Q.  Okay.  So the two favorites were Taylor and
11 Elia?
12     A.  Well, Elia --
13     Q.  -- right?
14     A.  -- was a lead as well.
15     Q.  Oh, okay.  I got you.  So -- so Taylor was a
16 favorite?
17     A.  Yes.
18     Q.  Okay.  And they would laugh and joke with
19 Taylor while all the other reservation agents had to
20 continue working; is that correct?
21     A.  Yes.
22     Q.  Okay.
23     A.  And sometimes George.
24     Q.  Sometimes George what?
25     A.  George Martinez would be up there too.  He

62

1 didn't have to do anything either.
2     Q.  Okay.  When you say, "sometime," what -- what
3 time period did this happen?
4     A.  After lunch most of the time.  If Ms. Butler
5 was there though it wouldn't happen.  If she was at a
6 meeting or somewhere else, then it was the usual thing.
7     Q.  Okay.  So sometimes George Martinez was treated
8 favorably.  Taylor, it sounds like she was -- Fernandez
9 was treated favorably a lot --
10     A.  A lot.
11     Q.  -- in your opinion, right?
12     A.  Yes.
13     Q.  And when this was going on, all the other
14 reservation agents present had to continue to take
15 calls?
16     A.  Yes.
17     Q.  Okay.  You are bringing a claim against VIA for
18 disability discrimination.  What facts do you believe
19 support your belief that you were discriminated against
20 based on your disability?
21         MR. CRANE:  Objection.  Calls for a legal
22 conclusion.
23         MS. MCELROY:  I asked her about the facts.
24         MR. CRANE:  You can answer.
25         THE WITNESS:  Okay.  They knew -- well,

63

1 Blanca.  Blanca knew that -- when my back was hurting.
2 I would even tell her.  Sometimes I had swelling where
3 Gloria would give me pain pills, ibuprofen, to help with
4 it, and there was at least two times that Blanca even
5 turned to Gloria because I told her that I wanted to go
6 home one time, and she said the calls were too high.  So
7 she asked Gloria, Don't you have any pain pills with
8 you?  So they gave me pain pills.  So I stayed.  I
9 stayed the rest of the day.
10     Q.  (BY MS. MCELROY)  Excuse me.  When you say,
11 "pain pills," are you talking about ibuprofen?
12     A.  Yes, ma'am.  800's.
13     Q.  Okay.  Did Gloria have a prescription for that?
14     A.  Yes, she did.
15     Q.  Okay.  Any other --
16     A.  Okay.
17     Q.  When -- when did -- when did this happen?
18     A.  Whenever I had pain.
19     Q.  Were you -- this is a specific time you're you
20 telling me about?
21     A.  Okay.  That one?
22     Q.  When --
23     A.  That was one time that two or three agents had
24 already quit again.  So we were very backed up.  That's
25 when they started mandating nobody could take their days

64

1 off.  Nobody could have their vacations.  So they
2 started mandating us, and she was in a really bad mood,
3 and it was always something.  That was one of the days
4 it was --
5     Q.  Was --
6     A.  -- that she had --
7     Q.  -- this in 2017?
8     A.  No.  No.  No.  That was in 2019.  In January.
9 It was the beginning of January.
10     Q.  January 2019?
11     A.  Yes, ma'am.
12     Q.  Okay.  What other facts are you -- do you
13 believe support your claim for disability
14 discrimination?
15         MR. CRANE:  Same objection.
16         THE WITNESS:  Okay.
17         MR. CRANE:  You can answer.
18         THE WITNESS:  I'm going to go back to
19 discrimination because that was really clear.
20     Q.  (BY MS. MCELROY)  That's my question.
21     A.  Okay.  On the holidays, Labor Day.  It was a
22 Labor Day.  It was 2018 and Elia was in charge.  She
23 would make fun of me.  She would tell me to marry a rich
24 man.  She would make comments about my body.  It was
25 very uncomfortable.  Gloria just laughed.  She never

65

1 really made fun of me, but when it was Elia and Blanca
2 they would. But that specific day I got an E-mail after
3 the Labor Day from Elia Chapa apologizing to me that she
4 knew it was inappropriate. She shouldn't have done it,
5 but --
6    Q. She sent an E-mail apologizing for making
7 comments about your body?
8    A. Yes.
9    Q. Okay.
10    A. And telling me to marry a rich man.
11    Q. Now, marrying a rich man had nothing to do with
12 your disability, correct?
13    A. No.
14    Q. And the comments about your body didn't have
15 anything to do with the dis -- your disability, did it?
16    A. No.
17    Q. Okay. What other facts are you aware of that
18 you believe support your claim for disability
19 discrimination?
20       MR. CRANE: Same objection.
21       THE WITNESS: I would have to sometimes
22 hang over the chair to -- to try to stretch. They would
23 call me a bat. They would say that I would hang over
24 like a bat and --
25    Q. (BY MS. MCELROY) Who is "they"?

66

1    A. At that time Gloria and Blanca. They would
2 laugh at me, say I was weird. They knew I had to
3 stretch. Then when I would get up to go to the bathroom
4 a few hours later, Blanca said I should have gone during
5 lunch and if I had to go again. I told her, yes, I
6 needed to stretch my legs too and, you know, she would
7 just make a comment not to take forever in there.
8    Q. Okay. She would tell you not to take forever
9 in the bathroom?
10    A. Yes.
11    Q. That didn't have anything to do with your
12 disability, does it?
13    A. Well, I had to get up and walk and everybody
14 knew my business when she would start saying that. So
15 yes, I thought so.
16    Q. Well, but your accommodation was to get up and
17 stand up, not to go to the bathroom?
18    A. To walk around.
19    Q. Right. But --
20    A. So the --
21    Q. -- not to go to the bathroom, correct?
22    A. Correct.
23    Q. Okay. So saying, Don't take forever in the
24 bathroom, doesn't have anything to do with your
25 disability, correct?

67

1    A. Okay. Correct.
2    Q. All right. What other facts are you aware of
3 that you believe support your belief that you were
4 discriminated against based on your disability?
5       MR. CRANE: Same objection.
6       THE WITNESS: I believe that -- I wanted to
7 work at home. I believe she discriminated against me at
8 that point.
9    Q. (BY MS. MCELROY) Who? Who is "she"?
10    A. Blanca.
11    Q. Why do you believe that?
12    A. Because she used my absences against me even
13 though they were covered by FMLA, even though they were
14 medical excuses. She used that as a reason of giving it
15 to George over me.
16    Q. You don't have personal knowledge of her using
17 that, do you?
18    A. Well, she told me --
19    Q. Well --
20    A. -- that's why she didn't give it to me.
21    Q. Yeah. She told you, but you had absence
22 problems that were outside of your FMLA leave, correct?
23    A. Not too many. Not for that year. I mean, if
24 you go back to when they hired me, but that didn't have
25 nothing to do with the present.

68

1    Q. You had absence problems -- you had -- you had
2 incurred eight points as of January 18th, 2019, correct?
3    A. Yes.
4    Q. And you had -- then you accrued another two
5 points as of March 9th, 2019, correct?
6    A. Okay. They hadn't cleared that up for FMLA
7 though. Those could have been taken off. We -- we
8 didn't know.
9    Q. You never -- those were never taken off, were
10 they, those points?
11    A. I don't know.
12    Q. Did you ever go to HR and say that I've been
13 given --
14    A. I never went to HR.
15    Q. Hang on. Let me finish.
16       MR. CRANE: Okay.
17    Q. (BY MS. MCELROY) Did you ever go to HR and
18 say, I've been given points for my FMLA leave?
19       MR. CRANE: Objection. The witness was
20 still answering the first question.
21       MS. MCELROY: No, she wasn't. She
22 interrupted me.
23       MR. CRANE: Sure she was.
24       THE WITNESS: No. I did not.
25    Q. (BY MS. MCELROY) And you've already told me

69

1  that this was administered to you, "this" being
2  Deposition Exhibit No. 10, on March 9th, 2019, and you
3  signed it acknowledging that you had ten attendance
4  points at that time, correct?
5      A. Correct.
6      Q. All right. So you don't have any personal
7  knowledge of whether or not Blanca Dominguez used your
8  FMLA absences to exclude you from working from home, do
9  you?
10     A. Other than what she told me. No.
11     Q. And she told you that you had absence problems,
12  correct?
13     A. Yes.
14     Q. Which you had been written up for, correct?
15     A. Yes.
16     Q. All right. And so she didn't say to you,
17  you -- you weren't chosen because of your FMLA leave.
18  She chose -- told you weren't chosen because of your
19  absence problems, correct?
20     A. Yes.
21     Q. Now, it was not part of your job at VIA to know
22  about disabilities that other employees had, correct?
23     A. Correct.
24     Q. And it was also not part of your job to
25  accommodate any employees' requests for an

70

1  accommodation, correct?
2      A. Correct.
3      Q. So you don't have any personal knowledge of
4  other agents who might have had accommodations that
5  weren't shared with you, correct?
6      A. Correct.
7      Q. Do you -- do you have any personal knowledge
8  of -- oh, wait. Let me back up.
9          Have you told me all the facts that you
10  believe support your claim of disability discrimination?
11         MR. CRANE: Same objection. Calls for a
12  legal conclusion. You can answer.
13         THE WITNESS: Too many to mention.
14     Q. (BY MS. MCELROY) Well, this is my opportunity
15  to know what you're going to testify about at trial,
16  ma'am. So I would like you to tell me every fact that
17  you believe supports your claim for disability
18  discrimination?
19     A. I mean, it was remarks on a daily basis.
20     Q. What kind of remarks? Other than what you've
21  testified to?
22     A. Yes. Losing weight might help my back
23  problems. I mean, that had to do with my back.
24     Q. Who -- who told you that?
25     A. Elia had brought it up. Gloria laughed and

71

1  Blanca said, Well, but that would help.
2      Q. Okay. What else?
3      A. That -- that would be all, just the comments.
4  There's just so many.
5      Q. Can you recall any other comments that you
6  believe were discriminatory based on your disability?
7      A. That I was weird.
8      Q. Who -- who told you you were weird?
9      A. They all had said it at one point, Blanca,
10  Gloria and Elia.
11     Q. Anything else?
12     A. That's about all that I can recall.
13     Q. Were you and Gloria personal friends?
14     A. Not really. When we started riding together we
15  talked more.
16     Q. Did you ever see each other outside of work
17  other than riding on --
18     A. Well --
19     Q. -- the bus to work together?
20     A. -- we live right next to each other. So --
21     Q. Oh, I didn't know that.
22     A. (Moving head up and down.)
23     Q. So was she like a next door neighbor?
24     A. Yes.
25     Q. And where were you living at that time?

72

1      A. 325 West Dickson.
2      Q. Okay. And so did you see each other socially?
3      A. No.
4      Q. But you would talk in the neighborhood?
5      A. Yes. Or if I would go back outside, she was
6  already out there on the swing or something.
7      Q. Do you have any personal knowledge of any
8  employee who was not disabled being treated better than
9  you at work?
10     A. Taylor Fernandez, George Martinez, Susie. I'm
11  not sure of her last name.
12     Q. So Taylor Fernandez, is that what you testified
13  to earlier, or is there --
14     A. Yes.
15     Q. -- more to that?
16     A. It's the same one.
17     Q. It's the same thing?
18     A. Uh-huh.
19     Q. Okay. And George Martinez because he was
20  allowed to work from home and you weren't?
21     A. No.
22     Q. Okay. Why was he treated better? What --
23  well, first of all, let me ask this question. You don't
24  have personal knowledge of whether Taylor Fernandez has
25  a disability or not, do you?

97

1    A. No.
2    Q. She has no personal knowledge of the attendance
3 issues you had while working at VIA, does she?
4        MR. CRANE: Objection. Form. Lack of
5 foundation.
6        THE WITNESS: Before she left she did.
7    Q. (BY MS. MCELROY) Well, she didn't -- she
8 wasn't involved in your disciplinary write-ups for
9 attendance, was she?
10   A. No.
11   Q. So she has no -- had no personal knowledge of
12 your attendance issues that you had at VIA, correct?
13       MR. CRANE: Objection. Lack of foundation.
14       THE WITNESS: I mean, she knew because we
15 would talk about it. So --
16   Q. (BY MS. MCELROY) And everything she knew she
17 learned from you, correct?
18   A. When she wasn't there, yes.
19   Q. Well, when she was there it wasn't her job to
20 track your attendance, right?
21   A. No, but she would see it. She would see it.
22   Q. Would see what?
23   A. If I had gotten there, I had missed the day
24 before. Gloria would say you got your excuse, right?
25 Yes. So that was everybody heard. Everybody saw.

98

1    Q. Okay. But she didn't have any personal -- did
2 you show her your write-up for your attendance issues?
3    A. Sometimes we shared evaluations.
4    Q. Okay. And you gave that to her, correct?
5    A. Yes.
6    Q. All right. So, again, she learned that from
7 you, not from her own personal knowledge, correct?
8    A. Correct.
9    Q. And the next page Ms. Garcia says, Debbie --
10 top of the page. Are you with me?
11   A. I am with you. Yes.
12   Q. Debbie had FMLA leave approved by the FMLA
13 department at VIA. But just recently before she was
14 fired, VIA said Debbie did not have FMLA approved leave
15 after all. Debbie was upset about that. Do you see
16 that?
17   A. Yes, I do.
18   Q. And this is also information that Ms. Garcia
19 learned from you, correct?
20   A. Yes.
21   Q. So she has no personal knowledge of what she's
22 talking about in this paragraph, correct?
23   A. Only by what I have told her.
24   Q. And likewise it wasn't part of her job duties
25 to track or manage your FMLA leave, correct?

99

1    A. Correct.
2    Q. And in fact just -- she wasn't even employed at
3 VIA at this time, correct?
4    A. No. But she had gone through similar problems
5 with Blanca.
6        MS. MCELROY: Object to the responsiveness
7 of the answer.
8    Q. (BY MS. MCELROY) It -- she was no longer
9 employed at VIA at this time, correct?
10   A. Correct.
11   Q. She has no personal knowledge about whether you
12 were fired, does she?
13       MR. CRANE: Objection. Never mind.
14       THE WITNESS: Well, she drove up as it was
15 happening.
16   Q. (BY MS. MCELROY) What do you mean, "She drove
17 up as it was happening?"
18   A. I was outside on the phone with Blanca and she
19 had just pulled into my driveway, which is right next to
20 me, and when I was trying to call Blanca back, I said, I
21 can't believe she just fired me. So, I mean, she was
22 right there as it happened.
23   Q. Well, she learned that from you, correct?
24   A. Well, yes.
25   Q. She never heard Blanca say you were fired,

100

1 correct?
2    A. That's correct.
3    Q. Likewise she has no personal knowledge of what
4 anyone at VIA told you about your FMLA, does she?
5        MR. CRANE: Objection. Lack of foundation.
6        THE WITNESS: There was always hearsay, but
7 not direct.
8    Q. (BY MS. MCELROY) So the answer is she has no
9 personal knowledge of what --
10   A. That is correct.
11   Q. -- VIA told --
12       Hang on. So the answer is she has no
13 personal knowledge about whether -- about what VIA told
14 you about your FMLA, correct?
15   A. Correct.
16   Q. And in fact -- in fact you have testified that
17 you did have FMLA approved in April of 2019, correct?
18   A. Correct.
19   Q. And she goes on to say, Debbie had back
20 problems for a long time. Do you see that?
21   A. Yes, I do.
22   Q. And did you tell her -- is that how she found
23 out you had back problems, you have told her that?
24   A. She saw it for herself.
25   Q. What do you mean by that?

157

1  me get my objection in. Lacks -- lacks foundation.
2  Calls for hearsay. Assumes facts not in evidence.
3      Q. (BY MR. CRANE) When did -- when did she say
4  that?
5      MS. MCELROY: Objections. Calls for
6  hearsay. Lacks foundation. Assumes facts not in
7  evidence.
8      THE WITNESS: Constantly throughout the
9  years. I was always -- in the year 2018, I was -- I
10 would say on every other month I was threatened I would
11 be fired -- that she was going to fire me.
12     Q. (BY MR. CRANE) Did you ever hear Blanca
13 threaten any other agent with termination?
14     MS. MCELROY: Objection. Calls for
15 hearsay. Lacks foundation. Calls for speculation.
16 Assumes facts not in evidence.
17     THE WITNESS: Yes.
18     Q. (BY MR. CRANE) When?
19     A. Janette --
20     MS. MCELROY: Objection. Calls for
21 hearsay. Lacks foundation. Assumes facts not in
22 evidence. Calls for speculation.
23     THE WITNESS: Janette Orozco, and she said
24 that in front of the agents and that's when Janette
25 said, You can't fire me. She said the B word. I quit.

158

1      Q. (BY MR. CRANE) You mentioned earlier that you
2  had a home on Dickson Street; is that correct?
3      A. Yes.
4      Q. Did you plan to stay in that home?
5      A. Yes.
6      Q. Why did you leave that home on Dickson?
7      MS. MCELROY: Objection. Asked and
8  answered.
9      THE WITNESS: After a year when nothing
10 happened with VIA and I knew they weren't going to
11 believe me and it was going to go with whatever Blanca
12 said, we both agreed I did not want to do that to Chris'
13 parents anymore.
14     Q. (BY MR. CRANE) Who is -- Chris who?
15     A. He is Gloria's mate.
16     Q. Live in -- they --
17     A. Yes.
18     Q. -- live together?
19     A. Yes.
20     Q. Up -- up to April 22nd of 2019, did you have
21 positive performance evaluations at VIA?
22     A. Yes.
23     Q. Did -- did -- the last one that you received,
24 did it say successful?
25     MS. MCELROY: Objection. Best evidence of

159

1  the document is the document itself. Calls for hearsay.
2      THE WITNESS: Yes.
3      Q. (BY MR. CRANE) Were you generally successful
4  in your job at VIA?
5      A. Yes. Everything but the absences and tardies,
6  and they were nowhere near as bad as they were in the
7  beginning, but the reason that I was tardy so much and
8  absent so much is because --
9      Q. Let me ask a separate question --
10     A. Sure.
11     Q. -- about that. Do you think if you went back
12 to work today you could be just as successful as you
13 were before?
14     MS. MCELROY: Objection. Calls for
15 speculation. Lacks foundation.
16     THE WITNESS: I believe I could.
17     Q. (BY MR. CRANE) Other than Blanca Dominguez, is
18 there any reason why you could not be a successful
19 reservation agent again?
20     MS. MCELROY: Objection. Calls --
21     THE WITNESS: No.
22     MS. MCELROY: -- for speculation.
23     THE WITNESS: There is not.
24     MS. MCELROY: Lacks foundation.
25     Q. (BY MR. CRANE) Up to April 22nd of 2019, were

160

1  you able to work full time if you had accommodation?
2      A. Yes.
3      Q. If you had accommodation today could you work
4  full time?
5      MS. MCELROY: Objection. Asked and
6  answered.
7      THE WITNESS: I believe with
8  accommodations, yes.
9      Q. (BY MR. CRANE) Would you pull out Exhibit
10 No. 15 and look at the second page?
11     MS. MCELROY: Tom, what is 15?
12     MR. CRANE: 15 is the Social Security
13 application.
14     MS. MCELROY: Thank you.
15     Q. (BY MR. CRANE) So the second page, lower
16 right-hand corner, it says 00551. So you see in the --
17 Ms. McElroy was asking you about -- there is a portion
18 towards the bottom where it says, I became unable to
19 work because of my disabling condition on April 22nd,
20 2019?
21     A. Yes.
22     Q. And then below it, it says, I am still
23 disabled. When you filled out this application was
24 there a place anywhere on here to say, I am disabled,
25 but I could work if I had accommodation?

165

1      THE WITNESS: Not likely.
2      THE REPORTER: Wait.
3      MS. MCELROY: Hang on. Objection. Calls
4  for speculation. Lacks foundation. Assumes facts not
5  in evidence.
6      Q. (BY MR. CRANE) Having known Blanca for 18
7  years do you think she would have joked and chatted with
8  people that she was fussing at on a regular basis?
9      MS. MCELROY: Objection. Calls for
10  speculation. Lacks foundation. Hearsay. Assumes facts
11  not in evidence.
12      THE WITNESS: No. But on top of that, they
13  would take two-hour lunches together.
14      Q. (BY MR. CRANE) With -- you mean with Blanca?
15      A. Yes.
16      Q. Would Gloria be at those two-hour lunches?
17      A. Yes.
18      MS. MCELROY: Objection. Calls for
19  hearsay. Lacks foundation and calls for speculation.
20      Q. (BY MR. CRANE) Would you have liked to have
21  gotten that work at home reservation agent position?
22      A. Yes.
23      Q. Why would that have benefitted you?
24      A. Because I wouldn't have to worry about absences
25  or tardies. I even told her I would work overtime. I

166

1  knew they were short. I said as long as I could work at
2  home, you know, I can work any hours and do whatever I
3  could have to help.
4      Q. What reason did Blanca give you for not
5  selecting you? Did -- or did -- let me rephrase it.
6  Did she give you a reason? Did she explain to why you
7  didn't get the job?
8      MS. MCELROY: Objection. Asked and
9  answered.
10      THE WITNESS: She did after I asked her a
11  couple of times.
12      Q. (BY MR. CRANE) What reason did she give you?
13      MS. MCELROY: Objection. Asked and
14  answered.
15      THE WITNESS: She said that I had too many
16  tardies and absences, but when it first came out that we
17  were going to get to work at home, I had asked her, with
18  Gloria there in the office, it was after lunch one day,
19  I -- when I heard about it, I said, Ss it going to have
20  to do with absences and tardies? At that point she
21  said, No. So I was very optimistic about it.
22      Q. (BY MR. CRANE) You -- you had hopes that you
23  might get the job?
24      A. Yes.
25      Q. And is it true, did you have too many absences

167

1  and tardies at that time?
2      MS. MCELROY: Objection. Lacks foundation.
3  Calls for speculation.
4      THE WITNESS: I don't believe so because I
5  had improved a lot.
6      Q. (BY MR. CRANE) Do you -- do you know if she
7  was counting some of your FMLA-related absences?
8      MS. MCELROY: Objection. Calls for
9  speculation. Lacks foundation. Hearsay.
10      THE WITNESS: I believe she was, and on two
11  different occasions I asked her if she was sure that it
12  was correct because I had been trying really hard and I
13  didn't believe that it was correct. I asked her if she
14  had added some to it. You know, what proof did she
15  have, and, you know, she didn't really respond. She
16  just said, We take -- we initial every -- we have
17  everything written down. After that point when I
18  brought that to her attention, then they started having
19  me initial if I was late, but before that we just had to
20  go by whatever she said.
21      Q. (BY MR. CRANE) Whatever Blanca said?
22      A. Correct. Because we didn't have a -- a
23  punch-in, you know, a time clock or anything like that.
24  It was all just writing on the paper.
25      Q. When -- when that -- when -- and you mentioned

168

1  earlier that somebody would talk about you when you
2  would go to the bathroom, Don't stay too long, and that
3  sort of thing. Was it Blanca who was saying that?
4      MS. MCELROY: Objection. Asked and
5  answered. Leading.
6      THE WITNESS: Yes. It was Blanca.
7      Q. (BY MR. CRANE) Was it anybody else?
8      A. Gloria and sometimes Elia.
9      Q. And you -- you have mentioned that you believe
10  that was related to your disability. Why did you think
11  that might be related to your disability?
12      MS. MCELROY: Objection. Asked and
13  answered.
14      THE WITNESS: Because it was personal.
15      Q. (BY MR. CRANE) Did Gloria Dominguez ever give
16  you ibuprofen at work?
17      A. Yes.
18      Q. What -- what kind of ibuprofen?
19      MS. MCELROY: Objection. Asked and
20  answered.
21      THE WITNESS: 800 milligrams.
22      Q. (BY MR. CRANE) How often would she do that?
23      A. At least two to three times a week. At least.
24      Q. Did Blanca know that Gloria would give you
25  prescription ibuprofen at work?

169

1     MS. MCELROY: Objection. Calls for
2 hearsay. Lacks -- speculation and lacks foundation.
3     THE WITNESS: Yes. There was one time --
4 or one or two times that Blanca suggested to Gloria if
5 she had some to give me some because I was -- my back
6 had been swollen and it was hurting a lot and I wanted
7 to go home, and there was too many calls on the queue.
8     Q.  (BY MR. CRANE) I mean, you're -- you're saying
9 that Blanca preferred that you would get pain pills
10 rather than go home for your chronic back condition?
11    A.  Correct.
12    MS. MCELROY: Objection. Calls for
13 speculation. Lacks foundation. Hearsay.
14    Q.  (BY MR. CRANE) When your back does flare-up
15 how does that impact you on your daily living?
16    A.  When it flares up if it hurts a lot, then I
17 can't really bend, but it will -- since I really haven't
18 been working it's not too bad. There's been a few days
19 where I can't bend and I can't sit too long. I can't
20 stand too long.
21    Q.  Can you walk?
22    A.  Not as far as I could, but yes.
23    Q.  And you -- you mentioned that you would do
24 stretches in your chair?
25    A.  Yes.

170

1     Q.  What -- what -- what are those stretches? If
2 I'm walking in there and you're doing your stretches,
3 what would I see?
4     A.  It would be a little strange. Sometimes -- the
5 majority of the time I would kneel facing the chair.
6 Like I would kneel this way facing the chair and kind of
7 just try to roll my back to stretch down, like to bend,
8 but not all the way because I was on my knees on the
9 chair. Other times if my back was hurting a lot I would
10 be stretching like that over, and sometimes when I could
11 feel like a muscle pull, I would just kind of hang there
12 a little bit.
13    Q.  For like a minute or two?
14    A.  Yes.
15    Q.  And -- and is this something that would have
16 been -- were you work -- was it like an open area where
17 you had different desks?
18    A.  Yes.
19    Q.  Would -- would the reservation agents have seen
20 you hanging or stretching on your chair?
21    A.  Yes.
22    Q.  Was it something if Blanca walked by she would
23 see it?
24    A.  Yes. She --
25    Q.  You -- you heard --

171

1     A.  She even commented that I looked like a bat.
2     Q.  You heard Blanca testify yesterday, correct?
3     A.  Correct.
4     Q.  Did you hear her say that she had no knowledge
5 that you had a chronic back condition?
6     A.  Yes, I did.
7     Q.  Was -- was that accurate? Do you think that
8 was truthful on her part?
9     A.  Not at all.
10    Q.  Is it possible that she could have been in your
11 work area and not seen you doing your stretching or
12 hanging on the chair?
13    A.  That's possible, but if she hadn't seen it she
14 wouldn't have commented on it.
15    Q.  When -- when did you start doing that
16 stretching in your chair and hanging on your chair? I
17 mean, what year? Was that 2017, 2019?
18    A.  I believe it was 2017. And the only thing that
19 would make me remember that is because when other agents
20 sometimes would do it, you know, just -- just because I
21 had done it, or they would try doing it, they would get
22 in trouble. They would get called into the office and
23 told not to do that because it was a safety -- safety
24 liability I think she said. And one of the agents said,
25 Well, how come Debbie can do it?

172

1     So at that point I got called into the
2 office again, and Blanca told me that the other agents
3 were asking, you know, that I'm getting away with more
4 and they want to know why. So to try to just walk
5 around instead or something, not to be hanging off my
6 chair as much.
7     Q.  Had -- had Blanca told you before that that it
8 was okay to do your stretches in your chair?
9     A.  She hadn't told me either way. She kind of
10 just would laugh when she saw me, and -- and her and
11 Blanca would say that I was weird or I was like a bat,
12 you know. So it was nothing bad at that point, but yes,
13 they did see me. It was kind of obvious.
14    Q.  Did -- did -- was it just Blanca who would call
15 you a bat or would other people do that?
16    A.  Just her and Gloria.
17    Q.  How -- how many times?
18    MS. MCELROY: Objection. Calls for
19 speculation. Asked and answered.
20    THE WITNESS: A few times.
21    Q.  (BY MR. CRANE) More than ten?
22    MS. MCELROY: Objection. Calls for
23 speculation. Asked and answered.
24    THE WITNESS: Throughout the year, yes.
25    Q.  (BY MR. CRANE) Was the VariDesk -- did that

173

1  help you at all?
2      A.  No.
3      Q.  Why?
4      A.  No.  Because -- it would help for a little bit,
5  but then it was the same thing.  I couldn't stand too
6  long.  I couldn't sit too long.  So the best thing that
7  would work for me was to move, to walk or to stretch.
8  Because, I mean, I could stand up too, but not for that
9  long, you know.  And it's easier to stand than sit, but
10  it was best just to be able to stretch.
11      Q.  Would you look at Exhibit No. 11?  That's those
12  text messages.  You testified in response to
13  Ms. McElroy's questions that -- I -- I think you
14  testified, I'm not sure actually, that these were mostly
15  from April 23rd.  Is that -- is that what you said?
16      A.  That's what I said, but it's -- they're all
17  different from different days.  It's almost like -- I
18  don't know.  Like from --
19          MS. MCELROY:  Objection.  Lacks foundation.
20  Speculation.
21          THE WITNESS:  Okay.  The reason I'm saying
22  that is because my --
23          MS. MCELROY:  Same objection.
24          THE WITNESS:  -- sister -- my sister is
25  giving me a ride.  I can still go in.  Right.  That was

174

1  like a totally different time period.  I mean, that
2  didn't even happen in -- within these text messages.
3      Q.  (BY MR. CRANE)  It says -- it says, March 28th
4  on that entry, correct?
5      A.  Yes.  On that entry, yes.
6      Q.  And then the one below it --
7      A.  Okay.
8      Q.  -- says April 23rd?
9      A.  That is correct.  Yes.
10      Q.  Were these the only text messages that you and
11  Blanca sent back and forth that day?
12          MS. MCELROY:  Objection.
13          THE WITNESS:  No.
14          MS. MCELROY:  Calls for speculation.  Lacks
15  foundation.  Hearsay.  Best evidence is the text message
16  -- messages themselves.
17      Q.  (BY MR. CRANE)  Did -- did you say no?
18      A.  I said no.
19      Q.  Do you think there were other text messages
20  besides these?
21          MS. MCELROY:  Same objections.
22          THE WITNESS:  Yes.
23      Q.  (BY MR. CRANE)  Why do you think that?
24          MS. MCELROY:  Same objections.
25          THE WITNESS:  Because some are missing.

175

1      Q.  (BY MR. CRANE)  Well, which -- can you remember
2  any that are missing?
3          MS. MCELROY:  Same objections.
4          THE WITNESS:  No.  It just doesn't make
5  sense.  It -- it doesn't make sense at all like just --
6  it just doesn't make sense to me.
7      Q.  (BY MR. CRANE)  In what way?
8          MS. MCELROY:  Same objections.
9          THE WITNESS:  Okay.  Like I said earlier,
10  it's a process.  That one was two to three days after.
11  It was like -- this was like on a Monday.  It was like
12  past that week.
13      Q.  (BY MR. CRANE)  You're pointing --
14      A.  It was after.
15      Q.  -- to --
16      A.  I'm sorry.
17      Q.  -- page 003?
18      A.  Yes.
19      Q.  And the comment about it's a process, you're
20  saying you think that was later than --
21      A.  It --
22      Q.  -- Tuesday?
23          MS. MCELROY:  Same --
24          THE WITNESS:  It was --
25          MS. MCELROY:  -- same -- hang on.

176

1          THE WITNESS:  -- two --
2          MS. MCELROY:  Same objections.
3      Q.  (BY MR. CRANE)  You think it's later than
4  Tuesday?
5          MS. MCELROY:  Same objections.
6          THE WITNESS:  Yes.
7      Q.  (BY MR. CRANE)  Did you say yes?
8      A.  Yes, I did.
9      Q.  Why do you -- that's just your memory?  You
10  think it -- that discussion about the process and the
11  comment about it being a process was later than -- came
12  later than April 23rd, Tuesday?
13          MS. MCELROY:  Same --
14          THE WITNESS:  Yes.
15          MS. MCELROY:  Objections.
16      Q.  (BY MR. CRANE)  Your testimony today, has it
17  always -- has it always been your testimony?
18      A.  Yes.
19      Q.  Have -- have you said anything today because me
20  or someone told you you should say something today?
21      A.  No.
22      Q.  On that same exhibit, Exhibit No. 11, you --
23  you see the text message on the first page, page 0001,
24  from Blanca to you, she says, There's other steps in
25  between.  I'm sorry, but you are not officially

177

1 terminated as of right now. What did -- what did you
2 understand Blanca to mean when she said, I'm sorry, but
3 you are not officially terminated as of right now?
4     A. I assumed that she had already spoken with
5 Daniel and Sylvia and at that point she thought of
6 telling me she didn't have the authority to fire me, but
7 this would have been the first time she had ever said
8 that to me in my 18 years. I -- she had threatened me
9 constantly about firing me and about my points and about
10 my tardies. So for her to say something like this --
11 she wouldn't have said anything like this if she hadn't
12 spoken to someone else who would have told her to say
13 something like this.
14     Q. Prior to this text message was there any doubt
15 in your mind that you had -- that she had fired you?
16     A. No doubt.
17     Q. Going back to the Friday before you got fired,
18 did you call in that day?
19     A. I sure did.
20     Q. Who did you call in to?
21        MS. MCELROY: Objection. Asked and
22 answered.
23        THE WITNESS: I first left a voice mail on
24 her answering machine because she would never answer to
25 us.

178

1     Q. (BY MR. CRANE) On whose? On whose?
2     A. On Blanca's. And we were told that if she
3 didn't answer to call Gloria. So instead of calling
4 Gloria -- because I knew the bus would be there at 6:15.
5 I knew Gloria got up at 5:00. So I went around the
6 house to the kitchen. I said Glo? Glo? And she came
7 out and I told her what had happened and she goes, Well,
8 did you leave a message on Blanca's machine --
9 recording? I said, Yes, I did. She goes, Well, okay.
10 I'll let her know.
11        You know, and she was a little -- she
12 looked -- I don't know if she was, but she looked a
13 little aggravated but, you know, she said okay. And
14 she's the same reason I went in on the 20th because
15 Gloria told me that I could. She goes, Well, we'll see
16 what she decides, but -- and she's the same one that
17 told me to E-mail Ms. Guzman.
18        And on the 20th there is an E-mail from me
19 to Ms. Guzman to see if FMLA was going to cover those
20 days and to let her know that I did call in yesterday,
21 which would have been Friday the 19th, and not only
22 that, but I had a doctor's schedule showing my
23 appointments.
24     Q. And then you worked on the 20th?
25     A. Yes, sir.

179

1     Q. At some point did Gloria tell you that you
2 should call Blanca?
3     A. Yes.
4        MS. MCELROY: Objection. Asked and
5 answered.
6     Q. (BY MR. CRANE) When was that?
7        MS. MCELROY: Same objection.
8        THE WITNESS: She had been telling me all
9 that day. She had told me a couple of times throughout
10 the day.
11     Q. (BY MR. CRANE) That -- that day, which day?
12     A. Saturday the 20th.
13     Q. And why -- why did she -- go ahead. What were
14 you going to say?
15     A. Okay. She had told me a couple of days -- a
16 couple of times during that day and I told her, Yes. I
17 already E-mailed Ms. Guzman, and I had left the message
18 with Blanca. She goes, Okay. Well, try her again. So
19 I did, but I don't know the time, but it was before
20 5:00 o'clock on the 20th. No response.
21        So then when me and Glo got back to the
22 houses, she goes, Okay. Well, then just call her Monday
23 since you don't go -- since you're off these two days,
24 just call her back on Monday to make sure that you can
25 go back Tuesday.

180

1     Q. Did -- did Gloria ever say whether you could go
2 back to work or not?
3     A. She -- well, she had told me I could go
4 Saturday, but she told me that she didn't know what
5 Blanca had decided yet. So again I thought Blanca was
6 the final decision since Gloria said, Well, I don't know
7 what Blanca has decided yet.
8     Q. Was Gloria a supervisor?
9     A. She was --
10        MS. MCELROY: Objection. Asked and
11 answered.
12        THE WITNESS: She was a lead, but she --
13 whatever Blanca said, Gloria said. Like, I mean, they
14 were -- it was -- they were -- it was like one. Talking
15 to one, you would be talking to the other, And I mean,
16 at that time for 18 years I thought they were cousins.
17 That's what we were told.
18     Q. (BY MR. CRANE) Would you look at Exhibit 5 in
19 your stack?
20     A. Okay. I have it.
21     Q. This is an E-mail from Blanca to -- well, you
22 don't know who it's to, do you, or do you? Do you know
23 who Blanca's E-mail was addressed to?
24     A. All of us. We all got this.
25     Q. Do you remember seeing this back in 2019?

185

1   my copy.
2           MR. CRANE: That is the write-up 2002.
3           MS. MCELROY: Got it. Thank you.
4           MR. CRANE: Some kind of -- I'm not sure.
5           THE WITNESS: Oh, okay. Yes. This time
6   since I had started improving, I believed that Blanca
7   had not been so true on my tardies or absences. I
8   believe she had lied about them because I was watching,
9   I was watching myself and that's why I wrote this little
10  comment.
11      Q. (BY MR. CRANE) What does that comment say?
12      A. It says, I disagree. We had to sign the paper
13  or we would go home. So I signed it, but I noted that I
14  disagree with two of these tardies. Blanca doesn't tell
15  me when she thinks I'm late. She just writes me up, and
16  let's see. And I would even as -- go as far as far as
17  the absences -- I can't really read that word. Oh,
18  there it is. I gave doctors' excuses, which I did,
19  which when I was late or absent I always -- always
20  showed it, you know, and I believe she had added some on
21  to make me look so -- not so good.
22          MS. MCELROY: Object to the responsiveness
23  of the answer. Lacks foundation and calls for
24  speculation.
25          THE WITNESS: Another thing I would like to

186

1   add --
2       Q. (BY MR. CRANE) Are you -- are you -- are you
3   clarifying -- are you finishing your answer?
4       A. Yes. Yes, please. I heard her in her
5   testimony when she said that for one to two days we
6   didn't need a doctor's excuse, you know, if we called
7   in, not until the third day, but that only worked for
8   the employees that she liked. It didn't work for me.
9       Q. How did it work for you?
10      A. I needed to -- if I missed a day, I had to give
11  her an excuse or she would check with the doctor.
12      Q. You mean if -- just one day?
13      A. Just one day.
14      Q. You would need a doctor's note?
15      A. Yes.
16      Q. You're saying yes?
17      A. Yes.
18      Q. And when did that -- I mean, when did that
19  start with you?
20      A. It's always been that way with me, and I mean,
21  I didn't have a problem because I wasn't lying. So I
22  would just ask the doctor for an excuse, whether it was
23  one day or whether I was going to be gone three days.
24      Q. Was that -- was that expensive to see a doctor
25  every time you have a one -- every time you have an

187

1   absence?
2       A. Yes, it was.
3       Q. How much would it cost to see the doctor and
4   get that medical note?
5       A. $85.
6           MR. CRANE: Could I see the exhibit
7   stickers, please? What's the next number?
8           MS. MCELROY: 17. It's already on there.
9           MR. CRANE: Thank you.
10          (Exhibit 17 marked.)
11      Q. (BY MR. CRANE) I'm showing you what's marked
12  Exhibit -- dang it -- 17?
13      A. Okay.
14      Q. You were present when I showed this exhibit to
15  Ms. Blanca Dominguez yesterday, correct?
16      A. Correct.
17      Q. Can you just briefly summarize what these
18  records -- what these papers represent?
19      A. My conditions. The pills I was on.
20      Q. Are these papers something you would have given
21  to somebody at VIA?
22      A. To Blanca, yes.
23      Q. Why?
24      A. Because she wanted them and I didn't want to
25  cause any more problems. I mean, they were personal. I

188

1   don't believe that I should have had to give them to
2   her, but I didn't want --
3       Q. But --
4       A. -- to lose my job either.
5       Q. But did these pertain to an absence? What --
6   what -- what were these?
7       A. This pertained to -- she didn't accept some of
8   them. Even though I had doctor's excuses, she -- she
9   wanted a reason behind them.
10      Q. Are you talking about Blanca?
11      A. I'm talking about Blanca, yes.
12      Q. Was -- was this -- when did you think -- when
13  do you remember giving these to Gloria or Blanca or --
14  or to whoever?
15      A. I don't remember the exact date, but 2019 from
16  the -- before the middle of January to the time that I
17  wasn't there anymore, it seemed like every day or every
18  week was a different problem. So I would just give her
19  whatever the doctor gave me. I would show it to Gloria
20  as proof. Now, some of this I didn't want Gloria to
21  turn it in, but I just wanted prove to her.
22      Q. If -- if you look in the lower right-hand
23  corner --
24      A. Uh-huh.
25      Q. -- right there --

197

1   problems related to her performance, do you?
2       A.  No.  I do not.
3       Q.  And you -- and you said that every other month
4   you were threatened with termination and you -- again,
5   you never went to HR to get help for that where you
6   thought you were being threatened; is that right?
7       A.  That is right.  I have a reason though I didn't
8   -- why we didn't go to HR.
9       Q.  Well, there's no question pending at this
10  point.  You said that George was promoted -- George
11  Martinez was promoted to his -- a position in
12  scheduling.  You don't have any personal knowledge of
13  who -- who made the decision to promote him, do you?
14      A.  We were all told Blanca.
15      Q.  Who told you that?
16      A.  Everyone was saying that, all the other agents.
17      Q.  Okay.  The other -- your -- your colleagues
18  were saying that, correct?
19      A.  Yes.  But she was there at the time.
20      Q.  And -- and none of your colleagues'
21  responsibilities involved promoting employees, correct?
22      A.  Correct.
23      Q.  And you don't know who had to approve George
24  Martinez being promoted, do you?
25      A.  Correct.

198

1       Q.  And you likewise don't know why George Martinez
2   was promoted, do you?
3       A.  No.  His wife told me that he just wanted that
4   position.
5       Q.  Who is his wife?
6       A.  She used to work there before.  Her name is
7   Deanna.
8       Q.  And you don't know if George Martinez has a
9   disability, do you?
10      A.  Not to my knowledge, no.
11      Q.  He could have.  You just don't know it; is that
12  right?
13      A.  It's possible.
14      Q.  Now, when you talked about working from home,
15  you were still if you worked from home going to have to
16  work -- get to work on time and not be tardy and work
17  your full shift, correct?  You knew that, right?
18      A.  Yes.
19      Q.  Okay.  So you said even though I would work
20  from home, I didn't have to worry about tardies.  You
21  would still have to worry about tardies.  You'd still
22  have to log on on time, correct?
23      A.  Right.  But it's walking into the next room as
24  to driving through construction.
25      Q.  (BY MS. MCELROY)  And on the --

199

1           MS. MCELROY:  Object to the responsiveness
2   of the answer after "right."
3       Q.  (BY MS. MCELROY)  And the entire time that you
4   worked at VIA and you were taking FMLA leave, you never
5   went to the FMLA leave coordinator and tried to verify
6   whether you had been improperly penalized for taking
7   FMLA, had -- did you?
8       A.  No.
9       Q.  Okay.  You never went to the FMLA coordinator
10  and brought your write-ups and said, Can you confirm
11  that none of this was FMLA, did you?
12      A.  No.  But I would like to now explain why I
13  didn't go to HR or to the coordinator or anyone.
14      Q.  Just -- just hang on.  Your --
15      A.  Okay.
16          MR. CRANE:  The witness is still answering
17  the question.
18          MS. MCELROY:  No.  She's answering a
19  different question, counsel.  She answered my question.
20          MR. CRANE:  Well, I object.
21      Q.  (BY MS. MCELROY)  Who was --
22          MR. CRANE:  The witness was asking the
23  question.
24      Q.  (BY MS. MCELROY)  Who was called into the office
25  and said that -- and told they couldn't stretch?

200

1       A.  Rephrase.
2       Q.  You've testified in response to your counsel's
3   question that an employee was called into the office by
4   Blanca --
5       A.  Oh, yes.
6       Q.  -- and told that he -- he or she couldn't
7   stretch.  Who was that?
8       A.  Janette Orozco.
9       Q.  Janette Orozco, the -- the employee who was
10  there for six months?
11      A.  Yes.
12      Q.  Anyone else?
13      A.  She's the only one I heard.
14      Q.  Okay.  And Blanca told you to try walking
15  around instead of stretching, correct?
16      A.  I -- I suggested that.  It helps when I walk
17  around.
18      Q.  And she agreed, correct?
19      A.  Yes.
20      Q.  And when did -- when did this happen?  I'm
21  trying to remember.
22          MR. CRANE:  Do you need to stand now?  Do
23  you want to stand while you're answering?
24          THE WITNESS:  Yeah.  Yes, please.
25          MS. MCELROY:  We can take a break.

205

1   on this, are you?
2      A. No. But I know how screenshots work.
3      Q. And you -- and you're speculating that they
4   could have been moved, correct?
5      A. That's correct.
6      Q. And again you have -- you don't have your own
7   phone to establish that it was a different date,
8   correct?
9      A. That's correct.
10     Q. And you also testified when you spoke to
11  your -- in response to your counsel question --
12  questions that you made an assumption that when she sent
13  this first -- this E-mail at the bottom of the first
14  page of Deposition Exhibit No. 11, that she spoke to Dan
15  and to Sylvia, correct?
16     A. Correct.
17     Q. You have no personal knowledge of whether she
18  spoke to Dan and Sylvia and was directed to send this
19  text message, correct?
20     A. Correct. But it did change. It changed from
21  when she told me I was fired to this.
22     Q. Well, it's what you --
23     A. So I assumed.
24     Q. -- what you --
25     A. Yes.

206

1      Q. -- what you're alleging on -- that she said to
2   you, but that's not what she said in her text messages,
3   correct?
4         MR. CRANE: Objection. Form. Objection.
5   Argumentative.
6      Q. (BY MS. MCELROY) Is that correct?
7      A. Well, I -- like I say, I -- she changed -- she
8   changed. She wouldn't have changed her attitude, her
9   talking, if she hadn't spoken to them.
10        MS. MCELROY: Objection. Nonresponsive.
11        THE WITNESS: Okay.
12     Q. (BY MS. MCELROY) You have no personal
13  knowledge of whether she spoke to either Daniel or
14  Sylvia prior to sending this text message?
15     A. I don't have proof.
16     Q. Okay. And anything that you believe is an
17  assumption that you're making, correct?
18     A. Correct.
19     Q. Okay. Now, these medical records that are --
20  that your counsel marked as Exhibit 17, if I understood
21  your testimony you testified that you gave these records
22  to Gloria --
23     A. Correct.
24     Q. -- is that correct?
25        Okay. So you gave these records to Gloria

207

1   and you don't know what she did with them, do you?
2      A. At that time, no. I know she had them in the
3   morning with her though.
4      Q. Okay. But you --
5         MS. MCELROY: Object to the responsiveness
6   of the answer.
7      Q. (BY MS. MCELROY) All I'm asking is, you gave
8   the records that appear in Exhibit No. 17 to Gloria and
9   you have no personal knowledge of what she did with
10  them, correct?
11     A. Correct.
12     Q. All right. And then this -- the -- the first
13  page of Exhibit No. 17 says, As of January 29th, 2019,
14  you are being given ibuprofen 600-milligram tablets.
15  Do you see that at the very top?
16     A. Yes.
17     Q. And it says you're taking that medication,
18  correct?
19     A. Yes.
20     Q. And so that's a prescription medication,
21  correct?
22     A. Yes.
23     Q. Then why did you have to get Gloria's
24  prescription medication?
25     A. Because I was taking these, but some days when

208

1   my back swells it's more pain. I -- I'm -- I can't
2   really function. So since Gloria had hers with her all
3   the time she would say, Okay. Well, I'll give you a
4   couple more. And after I took another one, then it
5   would help to function for a couple more hours.
6      Q. And why didn't you bring your medication with
7   you to work if you knew that could be a problem?
8      A. Because I would run out. When I had to work
9   more, my back would swell more, which meant I was in
10  more pain. So I would take more than -- than I had --
11  should have.
12     Q. Well, this -- okay. So the last -- look at
13  DS-567 on that exhibit.
14     A. Okay.
15     Q. This -- this was a doctor appointment you went
16  to April 16th, 2019, right?
17     A. Yes.
18     Q. And here it says you are taking ibuprofen
19  600-milligrams tablets, correct?
20     A. Yes.
21     Q. So you obviously had some right before you were
22  no longer employed at VIA, right?
23     A. Yes.
24     Q. And so would you have had those with you when
25  you were working?

209

1    A. No.
2    Q. Why not?
3    A. I didn't like to take medications to work. I
4  would take them before I left.
5    Q. So you would rather take Gloria's medication
6  than -- than what was prescribed for you?
7    A. It was either that or go home, and they didn't
8  want me to go home.
9    Q. Right. So then why not bring your own
10 medication to take?
11   A. I didn't like taking my medications to work.
12   Q. Why?
13   A. I just didn't.
14   Q. Okay. I got it. So look at Exhibit No. 12
15 that your counsel asked you some questions about.
16   A. Okay.
17   Q. And as your counsel said -- represented to you
18 that this is you, PCP is you?
19   A. Uh-huh.
20   Q. The only -- how would the E.E.O.C. have known
21 that you were -- had a vision issue unless you spoke to
22 them?
23   A. They could have been told.
24   Q. Well, by who?
25   A. Blanca, Gloria, my --

210

1    Q. Well --
2    A. -- my records. I don't know.
3    Q. Well, hang on. This is before you filed your
4  charge. So --
5    A. Uh-huh.
6    Q. -- Blanca and Gloria would not have been on
7  notice that you went to the E.E.O.C., correct?
8    A. I don't know.
9    Q. Okay. I mean, isn't it true that the only
10 reason that the -- the -- anybody at the E.E.O.C. as of
11 August 13, 2019, would have known that you had a vision
12 issue that you were accommodated for was because you
13 told them?
14   A. Okay.
15   Q. Do you agree with that?
16   A. Yes.
17   Q. And the only reason anybody at the E.E.O.C.
18 would have known you take -- took FMLA leave is because
19 you told them, correct?
20   A. Okay.
21   Q. Is that correct?
22   A. Like I said, I mean, it's poss -- it's
23 possible. Of course if I told them, yes, but I don't
24 remember any of this and I don't remember that person's
25 name. So --

211

1    Q. But there's no other source that they could
2  have had to get this information, is there?
3    A. I don't know. Anything is possible. I don't
4  know.
5    Q. Well, you say, "Anything is possible." If the
6  employer had received no notice of -- of the fact that
7  you had gone to the E.E.O.C., and -- and they have all
8  of this information that seems to be true -- you took
9  FMLA leave, right?
10   A. Yes, I did.
11   Q. And you told her that -- and -- and you had
12 absences that had caused you to accrue points, correct?
13   A. Yes.
14   Q. So that's all true, correct?
15   A. Okay. But that would be on my file too.
16   Q. I'm sorry. I don't understand.
17   A. I mean, I -- I don't remember this. I don't
18 know this person's name. This is the first time I see
19 it, so I don't know.
20   Q. Okay. But you also can't identify anybody else
21 who would have provided this information to the
22 E.E.O.C., correct?
23   A. Correct.
24      MS. MCELROY: Pass the witness.
25      MR. CRANE: Would you stand up? Do you

212

1  want to stand up?
2       THE WITNESS: Yes, if I can. Yes.
3       MS. MCELROY: If she's going to stand we're
4  going to take a break. So that's fine.
5       THE WITNESS: No.
6       MS. MCELROY: Yeah. We're off the record.
7       THE WITNESS: No. I'm sitting.
8       MS. MCELROY: We're off the record.
9       THE WITNESS: Well, I'm still sitting. So
10 I'm ready.
11      MS. MCELROY: We're off the record.
12      THE VIDEOGRAPHER: The time is 3:01 p.m.
13 and we are off record.
14      (Recess from 3:01 p.m. to 3:13 p.m.)
15      THE VIDEOGRAPHER: The time is 3:13 p.m.
16 and we are on record.
17         EXAMINATION
18 BY MR. CRANE:
19   Q. Ms. Santacruz, is your back in pain as we
20 speak?
21   A. Yes.
22   Q. Does it hurt to keep sitting?
23   A. Yes, a little.
24      MS. MCELROY: Counsel, I have offered to
25 take as long of a break as she needs until -- until her

EXHIBIT 4
WIT: D. Sontacruz
DATE: 6-15-22
DEBORAH DAVIDSON, CSR

Form 6007 (Rev. 7/89)

☐ ACTION        ☐ INFO ONLY

RESPONSE/
ACTION DUE BY _____



...opolitan Transit

...FICE CORRESPONDENCE

**TO:** Ms. Debra Santacruz            **FROM:** Dan Escobedo
                                               Reservation Superviser

**SUBJECT:** Excessive Absentism         **DATE:** March 22, 2002

Mr. Santacruz,

This is a written reminder to address your unacceptable attendance. We have met to discuss this situation several times already. This documents the dates that you have been out. This falls under step 3, VIA's Positive Discipline Policy.

You should be aware that unacceptable attendance is a serious situation as you are not able to fulfill responsibilities of a Reservation Agent. Attendance is an employee responsibility and you must do everything within your power to correct this problem.

A review of your attendance record indicate that you have out either sick or tardy on the following dates this past 6 months:

| | |
|---|---|
| September 12, 2001 | Tardy |
| September 17, 2001 | Off Early (sick) |
| October 3, 2001 | Out Sick |
| October 15, 2001 | Tardy |
| October 17, 2001 | Out |
| November 5, 2001 | Sick-left early |
| November 7, 2001 | Out |
| November 12, 2001 | Tardy |
| November 23, 2001 | Out |
| December 2, 2001 | Late- Car problems |
| December 9, 2001 | Tardy |
| December 12, 2001 | Left early |
| December 17, 2001 | Tardy |
| December 23, 2001 | Late back from lunch |
| December 25, 2001 | Out |
| January 4, 2002 | Left early-sick |
| January 7, 2002 | Tardy |
| January 9, 2002 | Tardy |
| January 11, 2002 | Out –sick |
| January 13-17, 2002 | Out –sick (doctor's note) |

CONFIDENTIAL

VIA_SANTACRUZ 000378

Form 6007 (Rev. 7/89)

We met to discuss this today and I asked you how you planned to correct your attendance. You stated that you had gone back to your doctor and were under medication and that you also purchase a heater to keep you warm.

I will monitor your attendance on a weekly basis starting Sunday, March 24, 2002. At the end of your work week we will sit down and evaluate your attendance for improvement.

I understand the contains of this correspondence.

Debra Santacruz : _Debra Santacruz_    3/22/02

Cc; employee personnel file
    Employee copy

CONFIDENTIAL

VIA_SANTACRUZ 000379